Opinion by Judge WILLIAM A. FLETCHER; Dissent by Judge DUFFY.
OPINION
W. FLETCHER, Circuit Judge:
Plaintiff Rahinah Ibrahim is a citizen of Malaysia and mother of four children. She was legally in the United States from 2001 to 2005 as a Ph.D. student at Stanford University. She alleges that the U.S. government has mistakenly placed her on the “No-Fly List” and other terrorist watchlists. On January 2, 2005, she attempted to travel to a Stanford-sponsored conference in Malaysia where she was to present her doctoral research. She was prevented from flying and was detained in a holding cell for two hours at the San Francisco airport. She was allowed to fly to Malaysia the next day, but she was prevented from returning to the United States after the conference. Ibrahim has not been permitted to return to the United States.
Ibrahim brought suit in federal district court seeking, among other things, injunctive relief under the First and Fifth Amendments, with the ultimate aim of having her name removed from the government’s watchlists. The district court denied injunctive relief. We reverse and remand for further proceedings.
*987 I. Factual Background
A. Ibrahim’s Departure
Ibrahim is Associate Professor and Deputy Dean of Research, Postgraduate Studies and International Affairs at the Faculty of Design and Architecture of the University Putra Malaysia in Serdang, Malaysia. She has a Ph.D. in Construction Engineering and Management from Stanford University in California, where she studied from 2001 to 2005 under a student visa.
This case has never gone beyond the complaint stage. For the narrative that follows, we rely on allegations in Ibrahim’s complaint and on statements in her declaration in the district court, assuming those allegations and statements to be true for purposes of our review. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322-23, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).
On January 2, 2005, Ibrahim attempted to fly to Kuala Lumpur, Malaysia, to present the results of her doctoral research at a Stanford-sponsored conference. She arrived at the San Francisco airport at about 7 a.m. for a 9 a.m. flight, accompanied by her 14-year old daughter and a friend. She requested wheelchair assistance to the gate because she was recovering from medical complications from a hysterectomy. When Ibrahim tried to check in at the ticket counter, a United Airlines employee, David Nevins, discovered her name on the federal government’s No-Fly List. Instead of issuing her a boarding pass, Nevins called the San Francisco police.
When San Francisco police officers arrived, they called the Transportation Security Operations Center,[1] a division of the federal Transportation Security Agency (“TSA”). A federal contractor employed by U.S. Investigation Services, Inc., John Bondanella, answered the call. Bondanella told the police to prevent Ibrahim from flying, to contact the FBI, and to detain Ibrahim for questioning.
At 8:45 a.m., fifteen minutes before her flight was scheduled to leave, San Francisco police officers handcuffed Ibrahim. They took her to a police station in the airport, searched her, and locked her in a holding cell. No one explained to Ibrahim why she had been arrested and detained. After about two hours, the FBI requested that the officers release her. Ibrahim was told by an unspecified person that her name no longer appeared on the No-Fly List.
The next day, Ibrahim went to the San Francisco airport to catch a different flight. An unspecified person told her that she was again (or still) on the No-Fly List. She was nonetheless allowed to fly to the Stanford-sponsored conference in Malaysia. She was subjected to enhanced screening at the San Francisco airport and at all stops en route to Kuala Lumpur.
Ibrahim was scheduled to return to Stanford to complete work on her Ph.D. on March 10. But when she arrived at the Kuala Lumpur airport, she was told by a ticketing agent that she would have to wait for clearance from the United States Embassy before she could board. Another ticketing agent told her that a note by her name instructed airport personnel to call the police and have her arrested. Ibrahim was not arrested but was prevented from boarding her scheduled return flight. She has never been permitted to return to the United States.
On March 24, 2005, Ibrahim submitted a request through TSA’s “Passenger Identity Verification” program to clear her *988 name. TSA failed to respond for approximately one year, and only did so after Ibrahim filed this suit. In a form letter, TSA responded to Ibrahim’s request by explaining that “[if] it has been determined that a correction to records is warranted, these records have been modified.” The letter did not state whether Ibrahim was, or was not, on the No-Fly List or other terrorist watchlists.
On April 14, 2005, an American consul in Malaysia sent Ibrahim a letter informing her that the Department of State had revoked her student visa on January 31, 2005, a month after her departure from the United States. The letter cited Ibrahim’s “possible ineligibility” under § 212(a)(3)(B) of the Immigration & Nationality Act (INA) as the reason for the revocation. That section of the INA provides, among other things, that “[a]ny alien” (1) who “has engaged in terrorist activity”; (2) who “a consular officer, the Attorney General, or the Secretary of Homeland Security knows, or has reasonable ground to believe, is engaged in or is likely to engage after entry in any terrorist activity”; or (3) who “has, under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity,” is inadmissible to the United States. 8 U.S.C. § 1182(a)(3)(B). The letter further stated that revocation of Ibrahim’s visa did “not necessarily indicate that [she was] ineligible to receive a U.S. visa in the future.” “That determination,” the letter continued, “can only be made at such time as you apply for a new visa.” Ibrahim applied for a new visa after she filed this lawsuit. We take judicial notice that the Department of State denied her application on December 14, 2009, during the pendency of this appeal. In a form letter with a series of boxes, a consular officer marked a box indicating that INA § 212(a)(3)(B) formed the basis of the denial of her visa. The letter did not explain how the consular officer arrived at his determination that she was suspected of terrorist activities.
Ibrahim’s inability to return to the United States has limited her academic and professional activities. She currently participates in a long-term project with Stanford to improve Malaysia’s construction industry. If she were not prevented from doing so, she would return to Stanford once a year to work on the project. The Malaysian university where Ibrahim currently teaches participated in a summer program at Stanford’s Center for Integrated Facility Engineering. Although Ibrahim was her school’s representative to Stanford, she was unable to participate in the program. Ibrahim collaborates with Stanford Professors Raymond Levitt and Renate Fruchter, and has co-authored several papers with Professor Fruchter. Ibrahim has stated in an affidavit that she is “occasionally able to meet face-to-face with U.S. citizens outside the United States” but has “otherwise had to use video conferencing and email instead, both of which are poor substitutes for face-to-face contact.” Selangor, a provincial government in Malaysia, also asked Ibrahim to act as its representative at a conference in San Francisco but she was unable to attend.
Ibrahim has close friends at Stanford whom she remains unable to visit. Her thesis advisor at Stanford, Professor Boyd Paulson, died in December 2005. Professor Paulson’s widow asked Ibrahim to speak at his memorial service, but she was unable to attend. Ibrahim states that she would like to “finally ... say goodbye to him at his grave.”
B. The Government’s Terrorist Watchlists
Since the terrorist attacks of September 11, 2001, the federal government has assembled a vast, multi-agency, counterterrorism bureaucracy that tracks hundreds *989 of thousands of individuals. See, e.g., 6 U.S.C. §§ 122,124h, 482, 485; Exec. Order No. 13388, 70 Fed. Reg. 62023 (Oct. 25, 2005). At the heart of this bureaucracy is the Terrorist Screening Center (“TSC”). Established by the Attorney General in 2003 pursuant to a presidential directive, the mission of TSC is “to consolidate the Government’s approach to terrorism screening and provide for the appropriate and lawful use of Terrorist Information in screening processes.” See Homeland Security Presidential Direetive/HSPD-6. Though administered by the FBI, TSC retains personnel from the Departments of State, Homeland Security, and Defense, and other federal agencies.[2]
TSC manages the Terrorist Screening Database (“TSDB”), the federal government’s centralized watchlist of known and suspected terrorists. The National Counterterrorism Center nominates known and suspected international terrorists to the TSDB, while the FBI nominates known and suspected domestic terrorists. TSC distributes subsets of the TSDB to other federal agencies to help implement the government’s counterterrorism initiatives. TSA uses two subsets of the TSDB — the No-Fly List and the Selectee List — to screen airline passengers. Individuals on the No-Fly List are prohibited from boarding American carriers or any flight having virtually any contact with U.S. territory or airspace. Individuals on the Selectee List are subject to enhanced security screening before boarding an airplane.[3] The State Department uses a subset of the TSDB to screen visa applicants through the Consular Lookout and Support System.[4]
The evidence and procedures used to nominate individuals to the TSDB are kept secret from the general public, as are the names of those in the TSDB. However, thousands of front line law enforcement officers from federal, state, local, territorial, and tribal agencies have access to the TSDB, as do some private sector entities and individuals.[5] As of January 2011, TSC had also agreed to share information with 22 foreign governments.[6]
Since its inception, the TSDB has grown by more than 700%, from about 158,000 records in June 2004 to over 1.1 million records in May 2009. In 2007, these records contained information on approximately 400,000 individuals.[7] As of 2007, the TSDB was increasing at a rate of 20,000 records per month.[8] TSC makes *990 400 to 1200 changes to the TSDB everyday.[9] It is the “world’s most comprehensive and widely shared database of terrorist identities.”[10]
In theory, only individuals who pose a threat to civil aviation are put on the No-Fly and Selectee Lists, but the Justice Department has criticized TSC for its “weak quality assurance process.”[11] In July 2006 — after the events that gave rise to this lawsuit — there were 71,872 records in the No-Fly List. After an internal review, TSC downgraded 22,412 records from the No-Fly List to the Selectee List and deleted entirely an additional 5,086 records. By January 2007, the TSC had cut the No-Fly List by more than half, to 34,230 records.[12] Tens of thousands of travelers have been misidentified because of misspellings and transcription errors in the nomination process, and because of computer algorithms that imperfectly match travelers against the names on the list.[13] TSA maintains a list of approximately 30,000 individuals who are commonly confused with those on the No-Fly and Selectee Lists.[14] One major air carrier reported that it encountered 9,000 erroneous terrorist watchlist matches every day during April 2008.[15]
Nomination and identification errors are so common that TSC organized a redress unit in 2007 to deal with complaints. The redress procedures have been opaque. A 2006 GAO report stated that an individual who submitted a query to TSC’s redress unit received an initial response letter that “neither confirms nor denies the existence of any terrorist watch list records relating to the individual.” [16] A 2009 internal DHS report stated, “With few exceptions, redress-seekers receive response letters that do not reveal the basis for their travel difficulties, the action the government took to address those difficulties, or other steps that they may take to help themselves in the future.”[17]
When Ibrahim filed suit, TSA managed a Passenger Identity Verification program for travelers who believed that they were mistakenly put on the No-Fly or Selectee List. In place of that program, the Department of Homeland Security (“DHS”) now manages the Traveler Redress Inquiry Program (“TRIP”). A 2007 Department of Justice audit commended TSC for accurately resolving redress queries, but noted that 45% of the reviewed records contained an error.[18] The 2009 DHS report was less charitable, concluding that the “TRIP website advises travelers that the program can assist them with resolving a range of travel difficulties. Our review of redress results revealed that those claims are overstated. While TRIP offers effective solutions to some traveler issues, it does not address other difficulties effectively, including the most common — watch list misidentifications in aviation security settings.”[19]
*991 II. Procedural Background
On January 27, 2006, Ibrahim filed suit against DHS, TSA, TSC, the FBI, the Federal Aviation Administration (“FAA”), and individuals associated with these entities (collectively, “the federal defendants”); the City and County of San Francisco, the San Francisco Police Department, the San Francisco Airport, the County of San Mateo, and individuals associated with these entities (collectively, “the city defendants”); and United Airlines, UAL corporation, and individuals associated with these entities (collectively, “the private defendants”). Ibrahim asserted § 1983 claims and state-law tort claims arising out of her detention at the San Francisco airport, as well as several constitutional claims based on the inclusion of her name on government terrorist watchlists. The district court dismissed her claims against the federal defendants under 49 U.S.C. § 46110(a), which vests exclusive original jurisdiction in the courts of appeals over suits challenging security orders issued by TSA.
A panel of this court reversed in part the district court’s dismissal of the federal defendants. We held that § 46110(a) does not bar district court jurisdiction over Ibrahim’s challenges to her placement on the government terrorist watchlists, including the No-Fly List, because the lists are managed by TSC rather than TSA. Ibrahim, v. Dep’t of Homeland Sec., 538 F.3d 1250, 1254-56 (9th Cir.2008). We held, however, that § 46110(a) requires all challenges to TSA’s policies and procedures implementing the No-Fly and other lists to be filed directly in the court of appeals. Id. at 1256-57.[20]
After remand, Ibrahim filed a Second Amended Complaint (“SAC”). In Claim 13 of her SAC, Ibrahim asserted several causes of action against the remaining federal defendants. Ibrahim alleges in Claim 13 that the inclusion of her name on the government’s terrorist watchlists violates her First Amendment right to freedom of association and her Fifth Amendment rights to due process and equal protection. She also alleges that the federal defendants violated the Administrative Procedure Act (“APA”), which we construe as an allegation that the APA waives the sovereign immunity of the United States, thereby allowing her claims under the First and Fifth Amendments and authorizing remedies for those claims. See Ibrahim, 538 F.3d at 1254. Ibrahim asks for an injunction that would require the government to take her name off its terrorist watch lists, including the No-Fly List, or, in the alternative, to provide procedures under which she could challenge her inclusion on those lists.
The federal defendants moved to dismiss Claim 13 for lack of standing and for failure to state a claim upon which relief can be granted. The government contended that Ibrahim has no standing under Article III of the Constitution. The government contended, further, that Ibrahim has no right to assert claims under the First and Fifth Amendments because she is an alien who has voluntarily left the United States.
The district court held that Ibrahim has standing. The district court speculated that Ibrahim’s inclusion in the No-Fly List might be a “monumental mistake,” but nonetheless dismissed Claim 13, holding that Ibrahim was “an alien who voluntarily left the United States and thus left her constitutional rights at the water’s edge.” *992 Ibrahim has settled her claims against the non-federal defendants. She appeals the dismissal of her Claim 13 against the federal defendants. She also appeals discovery rulings.
III. Standard of Review
We review de novo a district court’s dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Alonzo v. ACF Prop. Mgmt., Inc., 643 F.2d 578, 579 (9th Cir.1981). A complaint must state a claim for relief that is “plausible on its face.” Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). The facts in the complaint are liberally construed in the plaintiffs favor and are generally accepted as true. Id. The complaint, however, must allege “more than a sheer possibility that a defendant has acted unlawfully.” Id. We review discovery orders for abuse of discretion. Laub v. U.S. Dep’t of Interior, 342 F.3d 1080, 1084 (9th Cir.2003).
IV. Discussion A. Standing
“To satisfy Article Ill’s standing requirements, a plaintiff must show (1) she has suffered an ‘injury in fact’ that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.” Bernhardt v. Cnty. of Los Angeles, 279 F.3d 862, 868-69 (9th Cir.2002) (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). A plaintiff has the burden of showing that she has standing. See Takhar v. Kessler, 76 F.3d 995, 1000 (9th Cir.1996) (quoting Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).
Ibrahim seeks only prospective relief against the federal defendants. To establish standing under Article III, she “must demonstrate that [s]he is realistically threatened by a repetition of the violation,” Armstrong v. Davis, 275 F.3d 849, 860-61 (9th Cir.2001) (internal quotation marks, alterations, and emphasis omitted), abrogated on other grounds by Johnson v. California, 543 U.S. 499, 504-05, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005), or show a credible threat of future injury, City of Los Angeles v. Lyons, 461 U.S. 95, 106, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).
The government makes three standing arguments under Article III. First, it argues that Ibrahim has failed to allege that she is still on a government watchlist. The government refuses to confirm or deny whether Ibrahim is on a watchlist, but it contends that her SAC compels the conclusion that she is not now on the No-Fly List, given that she was allowed to fly to Malaysia the day after she was detained. The government ascribes the boarding denial in Malaysia to Ibrahim’s lack of a visa. Second, the government argues that a favorable judicial decision will not redress Ibrahim’s injury. The government notes that the revocation of Ibrahim’s student visa and her inability to obtain a new one independently bars Ibrahim from entering the United States, and that consular decisions denying visas are immune from judicial review. Third, the government argues that Ibrahim’s injury is hypothetical because she has no immediate plans to travel.
The government’s first argument is easily answered. The reasonable inference to draw from Ibrahim’s complaint is that she is on one or more government watchlists. When she flew from San Francisco to Malaysia, she was subject to enhanced *993 searches at the San Francisco Airport and all subsequent stopovers. In general, only individuals who are on the government’s Selectee List are subject to such searches. In Malaysia, a ticketing agent told Ibrahim that a note by her name instructed airport personnel to have her arrested. Would-be travelers to the United States are not typically subject to arrest before boarding merely for lacking a proper visa. When the State Department revoked Ibrahim’s student visa, it cited INA § 212(a)(8)(B), which bars entry of any persons known or suspected to be connected to terrorism. When Ibrahim applied for a new visa, the State Department denied her application for the same reason. The State Department reviews the Consular Lookout and Support System — a subset of the TSDB— to make visa determinations.
The government’s second argument, that a favorable decision will not redress her injury, is also unpersuasive. The government mischaracterizes Ibrahim’s injury by focusing solely on her inability to return to the United States. The No-Fly List prevents her from boarding any U.S. carrier, whether or not a flight departs from or lands in the United States. It also prevents her from flying over U.S. airspace. These are injuries unrelated to her lack of a visa. Further, TSC shares the TSDB with 22 foreign governments. We can reasonably infer that Ibrahim will suffer delays (or worse) when traveling abroad, even on foreign carriers, resulting from the presence of her name on the No-Fly List.
Even if Ibrahim’s injury were limited to her inability to enter the United States, she would still have standing. Ibrahim does not challenge the revocation of her visa, as decisions of consular officers to deny a visa are immune from judicial review. See Bustamante v. Mukasey, 531 F.3d 1059, 1060 (9th Cir.2008). But it is a reasonable inference that removal of her name from government watchlists would make a grant of a visa more likely. If Ibrahim’s name were removed from the TSDB, and thereby removed from the Consular Lookout and Support System, the State Department would be more likely to grant her a visa, given that it has relied on her alleged connection to terrorism as the basis for revoking her visa and denying her application for a new one. Though Ibrahim’s future ability to obtain a visa is uncertain and we would be powerless to review a denial, “plaintiffs need not demonstrate that there is a ‘guarantee’ that their injuries will be redressed by a favorable decision ... [PJlaintiffs must show only that a favorable decision is likely to redress [their injuries], not that a favorable decision will inevitably redress [their injuries].” Wilbur v. Locke, 423 F.3d 1101, 1108 (9th Cir.2005) (internal quotations omitted, emphasis and alterations in original) (quoting Graham v. FEMA, 149 F.3d 997, 1003 (9th Cir.1998), abrogated on other grounds by Levin v. Commerce Energy, Inc., — U.S. -, 130 S.Ct. 2323, 176 L.Ed.2d 1131 (2010)). As the district court correctly observed, “While obtaining a visa may stand as a potential obstacle to her entry into the United States, it does not completely foreclose redressability. Ibrahim is not required to solve all roadblocks simultaneously and is entitled to tackle one roadblock at a time.”
The government’s third argument, that Ibrahim’s injuries are hypothetical because she has no immediate plans to travel, is also unpersuasive. It is by no means clear that Ibrahim has no plans to travel to non-US destinations. As noted above, the presence of her name on the government’s No-Fly List imposes real limitations on such travel. Further, it is obvious from her SAC that Ibrahim will return to the United States if permitted to do so. Ibra *994 him regularly collaborates with professors in the United States, is a member of several professional organizations in the United States, and has an extensive network of close friends in the United States. Ibrahim has been invited to return to the United States on several occasions since filing this lawsuit and has been obliged to decline every invitation because of the legal obstacles to her return. These are not hypothetical “ ‘some day’ intentions.” Lujan v. Defenders of Wildlife, 504 U.S. 555, 564, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).
We therefore agree with the district court that Ibrahim has standing under Article III to challenge the presence of her name on government watehlists.
B. Constitutional Claims
Claim 13 of the SAC alleges that the placement of Ibrahim’s name on the government’s terrorist watehlists violates her right to freedom of association under the First Amendment and her rights to equal protection and due process under the Fifth Amendment.[21]
At this point in the litigation, no court has attempted to determine the merits of Ibrahim’s claims under the First and Fifth Amendments. The parties have not briefed whether her placement on a terrorist watchlist violates her rights to freedom of association, equal protection, and due process. The only question before us is whether Ibrahim even has the right to assert such claims.
We begin with the uncontested proposition that if Ibrahim had remained in the United States, she would have been able to assert claims under the First and Fifth Amendments to challenge her placement on the government’s terrorist watch-lists. It is well established that aliens legally within the United States may challenge the constitutionality of federal and state actions. See, e.g., Examining Bd. of Engineers, Architects and Surveyors v. Flores de Otero, 426 U.S. 572, 580, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976); Mathews v. Diaz, 426 U.S. 67, 77, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976); Hampton v. Mow Sun Wong, 426 U.S. 88, 101-03, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976); Sugarman v. Dougall, 413 U.S. 634, 641, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973); Kwong Hai Chew v. Colding, 344 U.S. 590, 596, 73 S.Ct. 472, 97 L.Ed. 576 (1953); Torao Takahashi v. Fish and Game Comm’n, 334 U.S. 410, 419-20, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948). Even aliens who are in the United States illegally may bring constitutional challenges, see, e.g., Plyler v. Doe, 457 U.S. 202, 211-12, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); Wong Wing v. United States, 163 U.S. 228, 237, 16 S.Ct. 977, 41 L.Ed. 140 (1896), including the ability to challenge *995 the revocation of a visa, see ANA Int’l, Inc. v. Way, 393 F.3d 886, 893-94 (9th Cir.2004) (allowing judicial review of INS decision to revoke temporary worker visa for purely legal questions, including constitutional challenges). The question in this case is whether Ibrahim lost the right she otherwise had because she left the United States.
The Supreme Court has held in a series of cases that the border of the United States is not a clear line that separates aliens who may bring constitutional challenges from those who may not. For example, a resident alien who voluntarily leaves the United States on a brief trip with an intent to return is constitutionally entitled to a due process hearing if the government seeks to exclude her upon return to the United States. See, e.g., Landon v. Plasencia, 459 U.S. 21, 34, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982) (resident alien entitled to constitutional due process hearing in exclusion proceedings upon re-entry after a “few days” abroad); Rosenberg v. Fleuti, 374 U.S. 449, 450, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963) (entry after innocent, casual, and brief excursion abroad did not qualify as “entry” for immigration purposes); Kwong Hai Chew, 344 U.S. at 593-95, 73 S.Ct. 472 (resident alien entitled to constitutional due process hearing after exclusion following a five-month voyage abroad). See also Boumediene v. Bush, 553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008) (aliens held as enemy combatants outside the de jure sovereign territory of the United States may petition for habeas corpus to challenge the constitutionality of their detention); Al Maqaleh v. Gates, 605 F.3d 84, 95-96 (D.C.Cir.2010) (location of alien outside the United States is only a factor in determining the extraterritorial reach of the Constitution); Nat’l Council of Resistance of Iran v. Dep’t of State, 251 F.3d 192 (D.C.Cir.2001) (a foreign organization with property in the United States entitled to constitutional due process hearing before Secretary of State may classify it as a “foreign terrorist organization”); Cardenas v. Smith, 733 F.2d 909, 915 (D.C.Cir.1984) (Colombian national outside the United States entitled to assert due process claim against U.S. government based on seizure of her Swiss bank account); In re Aircrash in Bali, Indonesia on April 22, 1971, 684 F.2d 1301, 1308 n. 6 (9th Cir.1982) (nonresident aliens suing on same cause of action as citizens have the right to assert takings claim).
In United States v. Verdugo-Urquidez, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), the Supreme Court wrote that “aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country.” Id. at 271, 110 S.Ct. 1056. The Court’s statement in Verdugo-Urquidez was an elaboration of its earlier language in Johnson v. Eisentrager, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950), that an alien “is accorded a generous and ascending scale of rights as he increases his identity with our society.” Verdugo-Urquidez, 494 U.S. at 269, 110 S.Ct. 1056 (quoting Eisentrager, 339 U.S. at 770, 70 S.Ct. 936) (internal quotations omitted). The Court wrote in Boumediene that the right of an alien outside the United States to assert constitutional claims is based on “objective factors and practical concerns” rather than “formalism.” 553 U.S. at 764, 128 S.Ct. 2229. In determining the constitutional rights of aliens outside the United States, the Court applies a “functional approach” rather than a bright-line rule. Id.
A comparison of Ibrahim’s case with Verdugo-Urquidez, Eisentrager, and Boumediene is instructive.
In Verdugo-Urquidez, plaintiff had been arrested in Mexico and brought against his will to the Mexico-United States border, where he was turned over to United States *996 authorities and imprisoned in the United States while awaiting trial on narcotics smuggling charges. The Court held that the plaintiff had “no previous significant voluntary connection with the United States” and therefore had no right to assert a Fourth Amendment challenge to searches and seizures of his property by United States agents in Mexico. Verdugo-Urquidez, 494 U.S. at 271, 110 S.Ct. 1056 (emphasis added).
Relying on Verdugo-Urquidez, the government insists that Ibrahim left the United States “voluntarily” and that she thereby forfeited any right to assert constitutional claims she might have had if she had remained in the United States. The government mistakes the nature of the Verdugo-Urquidez inquiry. Under Verdugo-Urquidez, the inquiry is whether the alien has voluntarily established a connection with the United States, not whether the alien has voluntarily left the United States. The circumstances of an alien’s departure may cast some light on whether the alien has established, and wishes to maintain, a voluntarily established connection with the United States. But the mere fact that an alien’s departure is voluntary tells us very little. In Ibrahim’s case, she left the United States to attend a Stanford-sponsored conference to present her academic research, performed in connection with her Ph.D. studies at Stanford, and she expected to return to Stanford after the conference to complete her studies. Ibrahim thus did not intend to sever her established connection to the United States by her voluntary departure, but rather to develop that connection further.
In Eisentrager, the plaintiffs were German citizens who had been arrested in China, convicted of violating the laws of war after adversary trials before a U.S. military tribunal in China, and sent to a prison in Germany to serve their sentences. The Supreme Court held that they did not have a right to seek a writ of habeas corpus under our Constitution. The Court summarized:
[To agree with plaintiffs that they are entitled to seek habeas] we must hold that a prisoner of our military authorities is constitutionally entitled to the writ, even though he (a) is an enemy alien; (b) has never been or resided in the United States; (c) was captured outside of our territory and there held in military custody as a prisoner of war; (d) was tried and convicted by a Military Commission sitting outside the United States; (e) for offenses against laws of war committed outside the United States; (f) and is at all times imprisoned outside the United States.
339 U.S. at 777, 70 S.Ct. 936.
Ibrahim’s case is unlike that of the plaintiffs in Eisentrager. She has not been convicted of, or even charged with, any violation of law. She is a citizen of a country with which we have never been at war. She contends that the placement of her name on the government’s terrorist watchlists is a mistake. Her contention is not implausible, given the frequent mistakes the government has made in placing names on these lists. She has established a substantial voluntary connection with the United States through her Ph.D. studies at a distinguished American university, and she wishes to maintain that connection.
In Boumediene, the plaintiffs were aliens who had been designated as enemy combatants and who were detained at the United States Naval Station in Guantanamo. Plaintiffs had not been tried or convicted of any crime. They sought federal habeas corpus. The government argued that because plaintiffs were aliens who had committed acts outside the United States and were being detained outside the United States, they were not entitled to seek *997 habeas relief. The Court rejected the government’s proposed bright-line rule, calling it a “formal, sovereignty-based test.” 553 U.S. at 764, 128 S.Ct. 2229. The Court wrote that while the United States does not have de jure sovereignty over the Naval Station at Guantanamo Bay, it “maintains de facto sovereignty.” Id. at 755, 128 S.Ct. 2229. Applying a “functional approach,” id. at 764, 128 S.Ct. 2229, the Court held that the plaintiffs in Boumediene, unlike the plaintiffs in Eisentrager, had a right to seek a writ of habeas corpus.
Ibrahim shares an important similarity with the plaintiffs in Boumediene. The Boumediene plaintiffs and Ibrahim both sought (or seek) the right to assert constitutional claims in a civilian court in order to correct what they contend are mistakes. In Boumediene, plaintiffs sought the right to try to establish they were not, in fact, enemy combatants. Ibrahim seeks the right to try to establish that she does not, in fact, deserve to be placed on the government’s watchlists.
The government in Boumediene proposed a bright-line “formal sovereignty-based test” under which the absence of de jure jurisdiction over Guantanamo would have meant that plaintiffs had no right to seek habeas corpus under the Constitution. The Court disagreed, adopting instead a “functional approach” under which the absence of de jure jurisdiction was not determinative. Id. at 764, 128 S.Ct. 2229. The government proposes a similar bright-line “formal sovereignty-based test” in Ibrahim’s case. Under the government’s proposed test in this case, any alien, no matter how great her voluntary connection with the United States, immediately loses all constitutional rights as soon as she voluntarily leaves the country, regardless of the purpose of her trip, and regardless of the length of her intended stay abroad. The government’s proposed test is not the law. The law that we are bound to follow is, instead, the “functional approach” of Boumediene and the “significant voluntary connection” test of Verdugo-Urquidez.
Under Boumediene and Verdugo-Urquidez, we hold that Ibrahim has “significant voluntary connection” with the United States. She voluntarily established a connection to the United States during her four years at Stanford University while she pursued her Ph.D. She voluntarily departed from the United States to present the results of her research at a Stanford-sponsored conference. The purpose of her trip was to further, not to sever, her connection to the United States, and she intended her stay abroad to be brief.
We do not hold that tourists, business visitors, and all student visa holders have the same connection to the United States as Ibrahim. Nor do we hold that Congress is without authority to exclude undesirable aliens from the United States and to prescribe terms and conditions for entry and re-entry of aliens. See, e.g., Hampton, 426 U.S. at 101 n. 21, 96 S.Ct. 1895; Gal-van v. Press, 347 U.S. 522, 530-31, 74 S.Ct. 737, 98 L.Ed. 911 (1954); Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 210-11, 73 S.Ct. 625, 97 L.Ed. 956 (1953). We hold only that Ibrahim has established “significant voluntary connection” with the United States such that she has the right to assert claims under the First and Fifth Amendments. Like the Court in Boumediene, we express no opinion on the validity of the underlying constitutional claims. Boumediene, 553 U.S. at 733, 128 S.Ct. 2229.
C. Discovery Rulings
1. Discovery Order
Ibrahim challenges a discovery order entered by the district court. After remand from this court but before the federal defendants were dismissed, Ibrahim *998 sought through discovery: (1) FBI phone logs; (2) TSA employee logs from the San Francisco airport; (3) TSA employee logs from the Transportation Security Operations Center; (4) the No-Fly List and other documents identifying Ibrahim as a candidate for special screening; (5) documents considered when placing Ibrahim’s name on the No-Fly List; (6) documents considered when placing Ibrahim’s name in the TSDB; (7) documents discussing her detention at SFO; (8) documents instructing law enforcement to arrest or detain Ibrahim; (9) documents discussing instructions about the incident exchanged between federal and local defendants; (10) documents discussing instructions about her between federal and local defendants; and (11) video recordings of certain conversations. The district court did not rule on these requests before dismissing the federal defendants.
After the federal defendants were dismissed, Ibrahim renewed her discovery request on the ground that these documents were relevant to her still-pending claims for damages against the city and private defendants. The district court ordered the federal defendants to produce documents numbered (1) through (3) and (7) through (11), above, because the information contained in these documents was relevant to Ibrahim’s still-pending claims.
However, the district court denied Ibrahim’s request for documents numbered (4) through (6), on the ground that the federal defendants had been dismissed and that the information contained in these documents was relevant, if at all, only to the claims against the now-dismissed federal defendants. The court also denied Ibrahim’s request for responses to interrogatories directed to the federal defendants, on the ground that interrogatories can be directed only to parties. Fed.R.Civ.P. 33.
We vacate the district court’s denial of discovery of these three categories of documents, and its denial of the request for interrogatories, in light of our holding that Ibrahim has the right to assert claims against the federal defendants under the First and Fifth Amendments. We leave it to the district court to determine whether, in light of our holding, all or part of Ibrahim’s discovery requests should be granted.
2. Disclosure of Non-testifying Experts.
Ibrahim also appeals the denial of her request to share Sensitive Security Information with her non-testifying experts. Sensitive Security Information is “information obtained or developed in the conduct of security activities ... the disclosure of which TSA has determined would ... [b]e detrimental to the security of transportation.” 49 C.F.R. § 1520.5(a)(3). Such information is shared only with “covered persons” who have a “need to know” the information “to carry out transportation security activities.” Id. at 1520.7®, 1520.11(a)(1). Under § 525(d) of the Department of Homeland Security Appropriations Act of 2007, Pub. L. No. 109-295,120 Stat. 1355,1382 (Oct. 4, 2006), Congress has authorized the disclosure of “Sensitive Security Information” during discovery to civil litigants who show “substantial need” for the information, provided that the district court
enters an order that protects the [Sensitive Security Information] from unauthorized or unnecessary disclosure and specifies the terms and conditions of access, unless upon completion of a ... terrorist assessment like that done for aviation workers on the persons seeking access to [Sensitive Security Information] ... the Transportation Security Administration or DHS demonstrates that such access to the information for the proceeding presents a risk of harm to the nation.
*999 Ibrahim argues that the identity of non-testifying experts is not discoverable, and that the identity of her experts will be revealed if they are required to submit to a TSA background check. Rule 26(b)(4)(D) provides, “Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial.” Ibrahim’s reliance on Rule 26 is misplaced for three reasons. First, Rule 26 shields only against disclosure through interrogatories and depositions; it does not shield against disclosure when information is required pursuant to a background check mandated by statute. Second, Ibrahim has not shown how a background check will reveal “facts known or opinions held” by her experts. Finally, the rule does not prevent disclosure of the identity of a nontestifying expert, but only “facts known or opinions held” by such an expert. See also Fed.R.Civ.P. 26(b)(3)(B) (preventing disclosure of “mental impressions, conclusions, opinions, or legal theories of a party’s attorney or other representative concerning the litigation”). The district court correctly held:
It is commonplace for experts and consultants on both sides of any ordinary civil action to be vetted so that trade secrets and other sensitive information will not fall into the hands of someone with an adverse position to the owner of the sensitive information (other than, of course, adverse parties to the litigation itself). The risk is simply too great that someone in such an adverse position will be tempted to misuse sensitive information for a purpose other than the litigation. For example, a trade secret might be misappropriated by a consultant or expert and written into a pending patent application. This risk is all the greater when dealing with [Sensitive Security Information] and national security. Indeed, it is hard to imagine any legitimate reason for suppressing the identity of experts or consultants and exempting them from the security screening process, given that our country has a legitimate need to know that those experts and consultants can be trusted with the [Sensitive Security Information] in this case.
(Emphasis in original).
Conclusion
We hold that Ibrahim has significant voluntary connection to the United States and she may therefore assert claims against the federal defendants for prospective relief under the First and Fifth Amendments. We vacate in part and affirm in part the district court’s discovery rulings.
We REVERSE in part, AFFIRM in part, and VACATE in part. We REMAND for further proceedings consistent with this opinion. Costs to Appellant.

. Subsequently renamed “The Freedom Center.” Transportation Security Administration, Transportation Security Operations Center Re-Named Freedom Center, at http:// www.tsa.gov/press/speeches/freedom_ dedication.shtm (last visited Aug. 30, 2011).

. Five Years After the Intelligence Reform and Terrorism Prevention Act: Stopping Terrorist Travel: Hearing Before the S. Comm, on Homeland Sec. and Governmental Affairs, 111th Cong. 1-2 (Dec. 9, 2009) (Statement of Timothy J. Healy, Director, Terrorist Screening Center) [hereinafter "Healy Statement”].

. U.S. Gov’t Accountability Office, GAO-08-110, Terrorist Watchlist Screening: Opportunities Exist to Enhance Management Oversight, Reduce Vulnerabilities in Agency Screening Processes, and Expand Use of the List 30 (2007) [hereinafter "2007 GAO Report”].

. Id. at 30.

. U.S. Gov’t Accountability Office, GAO-10-40 IT, Homeland Security: Better Use of Terrorist Watchlist Information and Improvements in Deployment of Passenger Screening Checkpoint Technologies Could Further Strengthen Security 2 (2010).

. U.S. Gov’t Accountability Office, GAO-11-335, Visa Waiver Program: DHS Has Implemented the Electronic System for Travel Authorization, but Further Steps Needed to Address Potential Program Risks 21 n.24 (2011).

. 2007 GAO Report at 8; U.S. Dep’t of Justice, Office of the Inspector General, Audit Division, Audit Report 09-25, The Federal Bureau of Investigation’s Terrorist Watchlist Nomination Practices i-ii & n.4 (2009).

. U.S. Dep’t of Justice, Office of the Inspector General, Audit Division, Audit Report 07-41, Follow-up Audit of the Terrorist Screening Center iii (2007) [hereinafter "2007 DOJ Report”].

. Healy Statement at 2.

. Id. at 1.

. 2007 DOJ Report at iii.

. Id. at 32-33 & n.49.

. U.S. Gov’t Accountability Office, GAO-06-1031, Terrorist Watch List Screening, Efforts to Help Reduce Adverse Effects on the Public 2, 4-6, 19-20 (2006) [hereinafter "2006 GAO Report"].

. Id. at 34.

. Dep't of Homeland Sec., Office of Inspector General, OIG-09-103, Effectiveness of the Department of Homeland Security Traveler Redress Inquiry Program (Redacted) 37 (2009) [hereinafter "2009 DHS Report”].

. See 2006 GAO Report at 31.

. 2009 DHS Report at 89.

. 2007 DOJ Report at xix.

. 2009 DHS Report at 33-34.

. Ibrahim had also filed a petition directly with the Ninth Circuit pursuant to § 46110(a). Because Ibrahim no longer resides in California, the panel transferred that petition to the D.C. Circuit. Ibrahim, 538 F.3d at 1253 n. 2. Proceedings there are being held in abeyance pending resolution of this appeal. Id.

. Claim 13 also alleges a violation of the Fourteenth Amendment, but Ibrahim's brief on appeal makes clear that this allegation refers to the equal protection component of the Fifth Amendment. See Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). The heading to Claim 13 also alleges a violation of the Fourth Amendment, but the body of Claim 13 makes no reference to the Fourth Amendment, and Ibrahim’s brief on appeal makes clear that she is alleging claims under only the First and Fifth Amendments.
Claim 13 also alleges violation of the Administrative Procedure Act, 5 U.S.C. § 500 et seq. We understand this to be an allegation that the APA waives the sovereign immunity of the United States for violations of the First and Fifth Amendments and authorizes remedies for such violations. The government contends that Ibrahim has waived any right to appeal the district court’s denial of her claim under the APA. We disagree, given that Ibrahim’s APA claim ultimately depends on the viability of her First and Fifth Amendment claims. See Califano v. Sanders, 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) (holding APA does not provide an independent basis for subject matter jurisdiction in district courts).