Justice KAVANAUGH delivered the opinion of the Court.
*2085 In 2003, Congress passed and President George W. Bush signed the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act, known as the Leadership Act. 117 Stat. 711, as amended, 22 U.S.C. § 7601 et seq. Aiming to enhance America's response to the ravages of the global HIV/AIDS crisis, the Leadership Act launched "the largest international public health program of its kind ever created." § 7601(29). The Act has helped save an estimated 17 million lives, primarily in Africa, and is widely viewed as the most successful American foreign aid program since the Marshall Plan.
To advance the global relief effort, Congress has allocated billions of dollars to American and foreign nongovernmental organizations that combat HIV/AIDS abroad. As relevant here, Congress sought to fund only those organizations that have, or agree to have, a "policy explicitly opposing prostitution and sex trafficking." § 7631(f) ; see also § 7631(e) ; 45 C.F.R. § 89.1 (2019). Congress imposed that condition on funding, known as the Policy Requirement, because Congress found that prostitution and sex trafficking "are additional causes of and factors in the spread of the HIV/AIDS epidemic" and that prostitution and sex trafficking "are degrading to women and children." § 7601(23).
Plaintiffs are American nongovernmental organizations that receive Leadership Act funds to fight HIV/AIDS abroad. Plaintiffs have long maintained that they do not want to express their agreement with the American commitment to eradicating prostitution. Plaintiffs consider a public stance of neutrality toward prostitution more helpful to their sensitive work in some parts of the world and also to their full participation in the global efforts to prevent HIV/AIDS.
After enactment of the Leadership Act, plaintiffs challenged the Policy Requirement, alleging that it violated the First Amendment. In 2013, this Court agreed, concluding that the Policy Requirement ran afoul of the free speech principle that the Government "may not deny a benefit to a person on a basis that infringes his constitutionally protected ... freedom of speech."
*2086 Agency for Int'l Development v. Alliance for Open Society Int'l, Inc. , 570 U.S. 205, 214, 133 S.Ct. 2321, 186 L.Ed.2d 398 (2013) (internal quotation marks omitted). Therefore, the Policy Requirement no longer applies to American organizations that receive Leadership Act funds, meaning that American organizations can obtain Leadership Act funds even if they do not have a policy explicitly opposing prostitution and sex trafficking.
But as has been the case since 2003, foreign organizations that receive Leadership Act funds remain subject to the Policy Requirement and still must have a policy explicitly opposing prostitution and sex trafficking. Following this Court's 2013 decision barring the Government from enforcing the Policy Requirement against American organizations, plaintiffs returned to court, invoking the First Amendment and seeking to bar the Government from enforcing the Policy Requirement against plaintiffs' legally distinct foreign affiliates. The U. S. District Court for the Southern District of New York agreed with plaintiffs and prohibited the Government from enforcing the Policy Requirement against plaintiffs' foreign affiliates. The U. S. Court of Appeals for the Second Circuit affirmed. Judge Straub dissented. He described as "startling" the proposition that the First Amendment could extend to foreign organizations operating abroad. 911 F.3d 104, 112 (2018). The Second Circuit's decision was stayed pending this Court's review, meaning that foreign organizations currently remain subject to the Policy Requirement.
We granted certiorari, 589 U. S. ----, 140 S.Ct. 660, 205 L.Ed.2d 417 (2019), and now reverse the judgment of the Second Circuit. Plaintiffs' position runs headlong into two bedrock principles of American law.
First , it is long settled as a matter of American constitutional law that foreign citizens outside U. S. territory do not possess rights under the U. S. Constitution. Plaintiffs do not dispute that fundamental principle. Tr. of Oral Arg. 58-59; see, e.g. , Boumediene v. Bush , 553 U.S. 723, 770-771, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008) ; Hamdi v. Rumsfeld , 542 U.S. 507, 558-559, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (Scalia, J., dissenting); United States v. Verdugo-Urquidez , 494 U.S. 259, 265-275, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) ; Johnson v. Eisentrager , 339 U.S. 763, 784, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) ; United States ex rel. Turner v. Williams , 194 U.S. 279, 292, 24 S.Ct. 719, 48 L.Ed. 979 (1904) ; U. S. Const., Preamble.
As the Court has recognized, foreign citizens in the United States may enjoy certain constitutional rights-to take just one example, the right to due process in a criminal trial. See, e.g. , Verdugo-Urquidez , 494 U.S. at 270-271, 110 S.Ct. 1056 ; Plyler v. Doe , 457 U.S. 202, 210-213, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) ; Kwong Hai Chew v. Colding , 344 U.S. 590, 596, 73 S.Ct. 472, 97 L.Ed. 576 (1953) ; Bridges v. Wixon , 326 U.S. 135, 148, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945) ; Yick Wo v. Hopkins , 118 U.S. 356, 369, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) ; cf. Bluman v. Federal Election Comm'n , 800 F.Supp.2d 281, 286-289 (DDC 2011), aff 'd, 565 U.S. 1104, 132 S.Ct. 1087, 181 L.Ed.2d 726 (2012). And so too, the Court has ruled that, under some circumstances, foreign citizens in the U. S. Territories-or in "a territory" under the "indefinite" and "complete and total control" and "within the constant jurisdiction" of the United States-may possess certain constitutional rights. Boumediene , 553 U.S. at 755-771, 128 S.Ct. 2229. But the Court has not allowed foreign citizens outside the United States or such U. S. territory to assert rights under the U. S. Constitution. If the rule were otherwise, actions by American military, intelligence, and law enforcement *2087 personnel against foreign organizations or foreign citizens in foreign countries would be constrained by the foreign citizens' purported rights under the U. S. Constitution. That has never been the law. See Verdugo-Urquidez , 494 U.S. at 273-274, 110 S.Ct. 1056 ; Eisentrager , 339 U.S. at 784, 70 S.Ct. 936.* To be sure, Congress may seek to enact laws that afford foreign citizens abroad statutory rights or causes of action against misconduct by U. S. Government officials, or laws that otherwise regulate the conduct of U. S. officials abroad. See Verdugo-Urquidez , 494 U.S. at 275, 110 S.Ct. 1056 ; cf. 10 U.S.C. §§ 2734(a), 2734a(a) ; 18 U.S.C. § 2340A ; 21 U.S.C. § 904 ; 22 U.S.C. §§ 2669, 2669-1 ; 42 U.S.C. § 2000dd ; but see 28 U.S.C. § 2680(k) (Federal Tort Claims Act's exception for torts "arising in a foreign country"). Plaintiffs did not raise any such statutory claim in this case.
Second , it is long settled as a matter of American corporate law that separately incorporated organizations are separate legal units with distinct legal rights and obligations. See Dole Food Co. v. Patrickson , 538 U.S. 468, 474-475, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003) ; Cedric Kushner Promotions, Ltd. v. King , 533 U.S. 158, 163, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001) ; P. Blumberg, K. Strasser, N. Georgakopoulos, & E. Gouvin, Corporate Groups §§ 6.01, 6.02, 6.05 (2020 Supp.).
Plaintiffs' foreign affiliates were incorporated in other countries and are legally separate from plaintiffs' American organizations. Even though the foreign organizations have affiliated with the American organizations, the foreign organizations remain legally distinct from the American organizations. Plaintiffs do not ask this Court to pierce the corporate veil, nor do they invoke any other relevant exception to that fundamental corporate law principle. Tr. of Oral Arg. 54.
Those two bedrock principles of American constitutional law and American corporate law together lead to a simple conclusion: As foreign organizations operating abroad, plaintiffs' foreign affiliates possess no rights under the First Amendment.
That conclusion corresponds to historical practice regarding American foreign aid. The United States supplies more foreign aid than any other nation in the world. Cong. Research Serv., Foreign Assistance: An Introduction to U. S. Programs and Policy (2020) (Summary). Acting with the President in the legislative process, Congress sometimes imposes conditions on foreign aid. See 22 U.S.C. §§ 2271, 2272, 2371, 7110(g)(2). Congress may condition funding on a foreign organization's ideological commitments-for example, *2088 pro-democracy, pro-women's rights, anti-terrorism, pro-religious freedom, anti-sex trafficking, or the like. Doing so helps ensure that U. S. foreign aid serves U. S. interests. By contrast, plaintiffs' approach would throw a constitutional wrench into American foreign policy. In particular, plaintiffs' approach would put Congress in the untenable position of either cutting off certain funding programs altogether, or instead funding foreign organizations that may not align with U. S. values. We see no constitutional justification for the Federal Judiciary to interfere in that fashion with American foreign policy and American aid to foreign organizations.
In short, plaintiffs' foreign affiliates are foreign organizations, and foreign organizations operating abroad have no First Amendment rights.
To overcome that conclusion, plaintiffs advance two main arguments. But neither persuades us.
First , plaintiffs theorize that the foreign affiliates' required statement of policy against prostitution and sex trafficking may be incorrectly attributed to the American organizations. Therefore, the theory goes, the American organizations themselves possess a First Amendment right against imposition of the Policy Requirement on their foreign affiliates.
As support, plaintiffs point to First Amendment cases involving speech misattribution between formally distinct speakers. See, e.g. , Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston , Inc., 515 U.S. 557, 574-575, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995) ; Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal. , 475 U.S. 1, 15, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (plurality opinion); cf. PruneYard Shopping Center v. Robins , 447 U.S. 74, 87, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). But the constitutional issue in those cases arose because the State forced one speaker to host another speaker's speech. See Hurley , 515 U.S. at 572-573, 115 S.Ct. 2338 ; Pacific Gas , 475 U.S. at 15, 106 S.Ct. 903 ; cf. PruneYard , 447 U.S. at 85, 87, 100 S.Ct. 2035. Here, by contrast, the United States is not forcing plaintiffs to affiliate with foreign organizations. Plaintiffs are free to choose whether to affiliate with foreign organizations and are free to disclaim agreement with the foreign affiliates' required statement of policy. Any alleged misattribution in this case and any effect on the American organizations' message of neutrality toward prostitution stems from their choice to affiliate with foreign organizations, not from U. S. Government compulsion. Because the First Amendment misattribution cases are premised on government compulsion to associate with another entity, those cases do not apply here.
In support of their misattribution argument, plaintiffs also cite Regan v. Taxation With Representation of Wash. , 461 U.S. 540, 544-545, and n. 6, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983). But as relevant here, that case simply explained that a speech restriction on a corporate entity did not prevent a separate affiliate from speaking, a point that is not disputed in this case.
We appreciate that plaintiffs would prefer to affiliate with foreign organizations that do not oppose prostitution. But Congress required foreign organizations to oppose prostitution in return for American funding. And plaintiffs cannot export their own First Amendment rights to shield foreign organizations from Congress's funding conditions.
Stressing that their position is limited, plaintiffs emphasize that the Court could narrowly decide to protect the free speech rights of only those foreign organizations that are closely identified with American *2089 organizations-for example, those foreign affiliates that share similar names, logos, and brands with American organizations. According to plaintiffs, those "closely identified" scenarios greatly increase the risk of misattribution. But again, the First Amendment cases involving speech misattribution arose when the State forced one speaker to host another speaker's speech. No compulsion is present here. Moreover, plaintiffs' proposed line-drawing among foreign organizations would blur a clear rule of American law: Foreign organizations operating abroad do not possess rights under the U. S. Constitution. Plaintiffs' carve-out not only would deviate from that fundamental principle, but also would enmesh the courts in difficult line-drawing exercises-how closely identified is close enough?-and leave courts without any principled basis for making those judgments. We discern no good reason to invent a new and legally unmoored exception to longstanding principles of American constitutional and corporate law.
Second , plaintiffs argue that the Court's 2013 decision in this case encompassed both plaintiffs' American organizations and their foreign affiliates, meaning that, in plaintiffs' view, the Court has already resolved the issue before us. That is not correct. The plaintiffs in the 2013 case were these same American organizations. It is true that the Court considered the possibility that an American organization could work through affiliates to potentially avoid the burdens of the otherwise-unconstitutional application of the Policy Requirement. But the Court rejected that alternative, which in essence would have compelled the American organizations to affiliate with other organizations. The Court instead ruled that the Policy Requirement may not be applied to plaintiffs' American organizations. Therefore, plaintiffs' current affiliations with foreign organizations are their own choice, not the result of any U. S. Government compulsion.
Stated simply, in the prior decision, the Court did not facially invalidate the Act's condition on funding. The Court did not hold or suggest that the First Amendment requires the Government to exempt plaintiffs' foreign affiliates or other foreign organizations from the Policy Requirement. And the Court did not purport to override the longstanding constitutional law principle that foreign organizations operating abroad do not possess constitutional rights, or the elementary corporate law principle that each corporation is a separate legal unit.
The dissent emphasizes that this case concerns "the First Amendment rights of American organizations." Post , at 2090 (opinion of BREYER, J.). We respectfully disagree with that characterization of the question presented. The Court's prior decision recognized the First Amendment rights of American organizations and held that American organizations do not have to comply with the Policy Requirement. This case instead concerns foreign organizations that are voluntarily affiliated with American organizations. Those foreign organizations are legally separate from the American organizations. And because foreign organizations operating abroad do not possess constitutional rights, those foreign organizations do not have a First Amendment right to disregard the Policy Requirement.
In sum, plaintiffs' foreign affiliates are foreign organizations, and foreign organizations operating abroad possess no rights under the U. S. Constitution. We reverse the judgment of the U. S. Court of Appeals for the Second Circuit.
It is so ordered.
Justice KAGAN took no part in the consideration or decision of this case.

The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co. , 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.