**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

THUNDER STUDIOS, INC.; RODRIC DAVID,

*Plaintiffs-Appellees*,

v.

CHARIF KAZAL; TONY KAZAL; ADAM KAZAL,

*Defendants-Appellants.*

No. 19-55413

D.C. No. 2:17-cv-00871-AB-SS

OPINION

Appeal from the United States District Court
for the Central District of California
André Birotte, Jr., District Judge, Presiding

Argued and Submitted June 3, 2020
Pasadena, California

Filed September 15, 2021

Before: William A. Fletcher and Kenneth K. Lee, Circuit
Judges, and Carol Bagley Amon,[*] District Judge.

Opinion by Judge W. Fletcher;
Dissent by Judge Lee

---

[*] The Honorable Carol Bagley Amon, United States District Judge for the Eastern District of New York, sitting by designation.

## SUMMARY[**]

### First Amendment

Reversing the district court's judgment, after a jury trial, in favor of defendants on a claim of stalking under Cal. Civ. Code § 1708.7, and remanding, the panel held that two defendants' speech and speech-related conduct were protected under the First Amendment and were therefore excluded from the California stalking statute as "constitutionally protected activity."

The panel held that under California law, a defendant commits the tort of stalking by "engag[ing] in a pattern of conduct the intent of which was to follow, alarm, place under surveillance, or harass the plaintiff." The stalking statute excludes "[c]onstitutionally protected activity" from the definition of a "pattern of conduct."

The panel held that the First Amendment applied to the speech and speech-related conduct of defendants Tarek ("Tony") and Adam Kazal, who were outside the United States at all relevant times, because their speech and speech-related conduct were directed at and received by California residents. Defendants hired protestors, organized leafletting, hired a van to drive around Los Angeles with a message on its side, and published emails online to make the public aware of their views of plaintiff's business practices.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that defendants' conduct did not constitute a "true threat" and therefore was protected under the First Amendment. The panel held that under an objective test, speech is a true threat if a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault. The panel stated that a subjective test, requiring that the defendant subjectively intended to threaten, applies in criminal cases. The panel wrote that it need not decide whether a true threat in civil cases requires both an objective threat and a subjective intent to threaten because Tony and Adam Kazal's speech did not satisfy either test.

Dissenting, Judge Lee wrote that he largely agreed with the majority's opinion. Judge Lee wrote, however, that he does not believe that the First Amendment—under its original public meaning—extends to foreigners, such as defendants, who lack substantial voluntary connection to the United States.

---

### COUNSEL

Hyland Hunt (argued) and Ruthanne M. Deutsch, Deutsch Hunt PLLC, Washington, D.C.; Benjamin Taylor, Law Offices of Benjamin Taylor APC, Los Angeles, California; for Defendants-Appellants.

Caleb E. Mason (argued), Werksman Jackson & Quinn LLP, Los Angeles, California; Seth W. Wiener, Law Offices of Seth W. Wiener, San Ramon, California; for Plaintiffs-Appellees.

Eugene Volokh, UCLA First Amendment Clinic, UCLA School of Law, Los Angeles, California, for Amicus Curiae Pennsylvania Center for the First Amendment.

## OPINION

W. FLETCHER, Circuit Judge:

After a business deal soured, Charif, Tarek ("Tony"), and Adam Kazal embarked on an international campaign to tell their side of the story, informing the public of the alleged "despicable crimes" committed by Rodric David, the erstwhile partner of Charif and Tony. The campaign culminated in Los Angeles, where David resides and runs a production company, Thunder Studios, Inc. The Kazals sent hundreds of emails to David and his employees, hired protestors to picket and distribute flyers near David's residence and business, and hired vans emblazoned with their message to drive around Los Angeles. David embarked on his own media campaign, accusing the Kazals of being money launderers with ties to Hezbollah.

David and Thunder Studios brought suit against Charif, Tony, and Adam Kazal in federal district court in Los Angeles. A jury found that Tony and Adam committed the tort of stalking under California Civil Code § 1708.7. It awarded David $100,000 in compensatory damages and $1 million in punitive damages against each of them. Because we conclude that Tony and Adam's speech and speech-related conduct were protected under the First Amendment and were therefore excluded from the California stalking statute as "constitutionally protected activity," we reverse.

## I. Factual Background

Three brothers, Charif, Tony, and Adam Kazal, are Australian citizens who reside in Australia. Rodric David is an Australian citizen who currently resides in Los Angeles.

The story begins with a business deal that went bad. In 2008, Charif and Tony Kazal, together with David, founded Emergent Capital, a private equity group headquartered in the United Arab Emirates ("UAE") and incorporated in the Cayman Islands. They planned to build a massive housing development in the UAE desert. David moved from Australia to Abu Dhabi to oversee the project. Emergent Capital also purchased a waste recycling business in Australia called Global Renewables. In the wake of the global financial crisis in 2008, the housing development project fell through. Contending that Charif and Tony had not put the funding into the project that they had promised, David convened a board meeting at which the board converted David's debt to equity and diluted the Kazals' 50% stake in the company to 0.1%. Charif and Tony responded by filing an embezzlement complaint against David and falsely alleging that he had violated his visa, resulting in David's detention in a UAE jail for two days. In litigation in the Cayman Islands, David's restructuring of the company was reversed in part, and the assets were liquidated. The net return to shareholders was about $25 million, of which Charif and Tony received $1.9 million. A few years later, a private equity company purchased a 50% stake in Global Renewables for $85 million.

David and his family moved back to Australia in 2010. According to evidence presented at trial in the district court, the Kazals were investigated by the Independent Commission Against Corruption for the Australian state of New South

Wales. Charif Kazal testified that David triggered the investigation by providing misleading information to the *Sydney Morning Herald*. David testified that, on one occasion in 2011, a man in a car followed his wife. When David confronted him, the man grabbed David's phone and sped down the block with David on the hood, holding onto a windshield wiper. David testified that it was his "understanding" that the man was employed by Tony Kazal. David's wife testified that "two of the Kazal brothers" followed David and a business associate and "sw[ung] something in a threatening manner." She testified further that in 2013, Adam Kazal, the brother who had not been party to the business deal, "accosted" or "assault[ed]" (using the words interchangeably) David's father in downtown Sydney. David testified that his father had been "assaulted repeatedly" by Adam, and that his father had obtained a New South Wales police order against him.

In early 2012, David moved with his family to the United States. He settled in Los Angeles, where he founded Thunder Studios. In about 2015, Charif and Tony Kazal began sending emails to David and Thunder Studios employees, demanding that David right his alleged wrongs. A representative excerpt of one of Tony's emails reads:

> We are not going away and look very much forward to the ongoing opportunities to deal with you in Court where your Sydney Morning Herald security blanket can't help you.
>
> . . . I will not rest until you repay what you stole plus damages, apologise publicly for the lies you told and serve time in prison for the

despicable crimes you committed against me
and my entire family!

Charif established a website to publish these emails online.

Matthew Price, an employee of Thunder Studios, then created several websites accusing the Kazal family of money laundering and other crimes, claiming that the Kazals were affiliated with the terrorist organization Hezbollah. The websites included pictures of the brothers with the text "Support Hezbollah" added above them. Immediately below was a picture of Libyan leader Muammar Qaddafi.

In October 2016, Tony and Adam Kazal hired Mark Woodward, a private investigator in Los Angeles, to "conduct[] covert surveillance" of David's house and his movements to "establish patterns." The Kazals then had Woodward procure a van, adorn it with a large sign about David's alleged misdeeds, and have his business partner drive it around town. The Kazals also hired protestors to distribute flyers denouncing David and to picket near David's house and Thunder Studios, chanting slogans like "Rodric the Robber." David's wife testified that the protesters were 250 meters away and not visible from the house. The flyers and signs included a picture of David and denounced him as a "corporate thief" and "fraudster" who "robbed his business partners of $180 million." They also warned readers "don't be his next victim" and advised them to "read the full story" on the Kazals' website. David's wife testified that she called the Los Angeles Police Department. On arrival at the scene, officers explained to her that people have "a right of protest and a right of free speech." There were additional protests on several days in November, both in David's neighborhood and near Thunder Studios. David testified that, as an employee

drove into the main entrance of Thunder Studios, "her car was hit and [protesters] were yelling profanities at her."

On October 27, 2016, Adam Kazal sent an email to David, with copies to several Thunder Studios employees, stating, "My team in LA are going to expose you wherever you go until you are charged with your crimes." It continued:

> Getting your hyena [David's wife] to scream at the LA Police like she did yesterday exposing how the disgustingly racist elements of your family are not restricted just to your Syrian David blood is not going to stop me and my crew!!

> I will show the good people of LA what scum they have allowed into their city that Australia is glad to be rid of. Let's see how you like having the truth of what you get up to reported for the world to see your true colours.

> . . .

> You start a fight with me, I will show you how Adam Kazal is different to the rest of the family.

> See you around grub.

Adam also published a screenshot of this email with a tweet stating, "hey @Rodric_David my team in LA are going to expose you wherever you go! - Day 1 . . . @Thunder_Inc."

At about this time, David's attorney sent Adam Kazal a cease and desist letter. Adam responded by email, stating that unless David paid his "Legal & Marketing, Pain & Disruption" costs of $666,666.66 and issued a public apology by 4:00 pm the next day, "I reserve the right to not only continue using the Van, but to also increase the size of my fleet." He continued, "If you fail to meet my demands . . . then I reserve the right to do whatever is necessary to expose the Corporate Fraudster[] Rodric David . . . who stole $180 million from my family[.]"

So far as the record reveals, other than the conduct just described, the Kazals have few ties with the United States.

## II. Procedural Background

In February 2017, David and Thunder Studios filed suit against Charif, Tony, and Adam Kazal in federal district court. In Count One of the second amended complaint, they alleged that the Kazals intentionally used photographs copyrighted by Thunder Studios. In Count Two, they alleged that the Kazals' conduct constituted stalking under California Civil Code § 1708.7.

The case was tried to a jury in December 2018. During jury deliberations, the Kazals moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) on both Counts. The district court denied the motion. On Count One, the jury returned a verdict for Thunder Studios for $2,600 in statutory damages against Charif Kazal for copyright infringement. The jury awarded nothing against Tony and Adam Kazal. On Count Two, the jury awarded Rodric David $100,000 in compensatory damages and $1,000,000 in punitive damages on the stalking claim against Tony, and the

same amounts separately against Adam.  The jury awarded nothing against Charif.

Tony and Adam Kazal made a renewed motion for judgment as a matter of law.  *See* Fed. R. Civ. P. 50(b).  The district court denied the motion, concluding that "a reasonable jury could perceive Defendants' actions as threats" and therefore unprotected by the First Amendment. Because their actions were unprotected by the First Amendment, they came within the coverage of California's stalking statute.  It also denied their motions for a new trial and for remittitur.

Tony and Adam Kazal timely appealed the judgment on Count Two.

## III.  Standard of Review

In First Amendment cases, we "'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499 (1984) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 284–86 (1964)). Therefore, we review constitutional facts *de novo*, including whether speech constitutes a "true threat" and is therefore unprotected by the First Amendment.  *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1069–70 (9th Cir. 2002) (en banc).  However, we "construe the historical facts, the findings on the statutory elements, and all credibility determinations in favor of the prevailing party."  *Id.* at 1070.

## IV.  Discussion

Under California law, a defendant commits the tort of stalking by "engag[ing] in a pattern of conduct the intent of which was to follow, alarm, place under surveillance, or harass the plaintiff."  Cal. Civ. Code § 1708.7(a)(1).  The pattern of conduct must lead the plaintiff either to "reasonably fear[]" for his own safety or that of an immediate family member, or to "suffer substantial emotional distress" when a reasonable person would also suffer substantial emotional distress.  *Id.* § 1708.7(a)(2)(A), (B); *see also id.* § 1708.7(a)(3) (articulating additional elements that must be satisfied).  The statute proscribes only conduct occurring in California.  *See Diamond Multimedia Sys., Inc. v. Superior Ct.*, 968 P.2d 539, 554 n.20 (Cal. 1999) (the determinative factor in California's presumption against extraterritoriality is the location of the conduct).

The stalking statute excludes "[c]onstitutionally protected activity" from the definition of "pattern of conduct."  Cal. Civ. Code § 1708.7(b)(1); *see also id.* § 1708.7(f) ("This section shall not be construed to impair any constitutionally protected activity, including, but not limited to, speech, protest, and assembly.").  The question before us is whether Tony and Adam Kazal's conduct was protected by the First Amendment and thus excluded from coverage under the statute.[1]

---

[1] The statute also excludes from liability Woodward's covert surveillance activities, prior to his activity involving the van with the message about David's alleged misdeeds.  The statutory definitions of "follow" and "place under surveillance" exclude "any lawful activity of private investigators licensed pursuant to Article 3 (commencing with Section 7520) of Chapter 11.3 of Division 3 of the Business and Professions Code."  *See* Cal. Civ. Code § 1708.7(b)(4), (b)(6).  The

### A.  Applicability of the First Amendment

A threshold question is whether the First Amendment applies to the Kazals' conduct.  So far as the record shows, Tony and Adam were outside the United States at all relevant times.  However, the recipients of their speech and speech-related conduct were in California.

The First Amendment protects speech for the sake of both the speaker and the recipient.  The Supreme Court wrote in 1968, "It is now well established that the Constitution protects the right to receive information and ideas.  This right to receive information and ideas, regardless of their social worth, is fundamental to our free society."  *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (citations omitted); *see also Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) ("[W]here a speaker exists . . . the [First Amendment] protection afforded is to the communication, to its source and to its recipients both." (citation omitted)); *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) (freedom of speech "embraces the right to distribute literature and necessarily protects the right to receive it" (citation omitted)).

Absent national security concerns not present in this case, the First Amendment right to receive information includes the

---

Business and Professions Code defines private investigator activities to include "any investigation for the purpose of obtaining[] information with reference to . . . the . . . habits, conduct, . . . activity, [and] movement . . . of any person." Cal. Bus. & Prof. Code § 7521(b). Woodward's activities are excluded because he is a licensed private investigator, and he testified that the purpose of his surveillance was to obtain information on David's conduct and movements.  This argument was preserved when the Kazals pressed it in their motion for judgment as a matter of law.

right to receive information from outside the United States. In *Lamont v. Postmaster General*, 381 U.S. 301, 302 (1965), the Court struck down a federal statute ordering the Postmaster General to seize "communist political propaganda" that was "printed or otherwise prepared in a foreign country." The Court explained that the government could not constitutionally "control the flow of ideas to the public." *Id.* at 306. In *Kleindienst v. Mandel*, 408 U.S. 753 (1972), the Court recognized the First Amendment right of domestic listeners to receive speech from foreign speakers. However, the Court held that Congress's plenary power over immigration permitted the government to exclude a foreign speaker from the United States on the ground that on a previous visit "he had engaged in activities beyond the stated purposes" of his visit. *Id.* at 758. In one of the most famous obscenity cases in our history, the district court declared James Joyce's *Ulysses* not obscene and allowed its importation into the United States without any inquiry as to Joyce's contacts with the United States. *United States v. One Book Called "Ulysses"*, 5 F. Supp. 182 (S.D.N.Y. 1933), *aff'd*, 72 F.2d 705 (2d Cir. 1934).

We therefore hold that the First Amendment applies to Tony and Adam Kazals' speech and speech-related conduct at issue in this case.

Plaintiffs disagree with this conclusion, but provide scant support for their conclusion. Citing four cases, they contend, "As foreign non-residents, living outside the United States, with no connection or allegiance to the United States, they cannot claim the protections of the First Amendment." None of the four cases support Plaintiffs' contention, as they either do not involve speech at all or involve speech outside the United States.

Plaintiffs primarily rely on *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), arguing that the Kazals "do not clear the *Verdugo-Urquidez* bar." *Verdugo-Urquidez* was a Fourth Amendment case in which a citizen and resident of Mexico challenged a search and seizure search of his property in Mexico. Speech was not at issue, and the only action at issue occurred outside the United States. Plaintiffs also rely on *DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275 (D.C. Cir. 1989) as "[t]he other leading case." *DKT Memorial Fund* involved a challenge to a federal statute that forbade giving federally financed family planning grants to organizations that "actively promote abortions in other nations." *Id.* at 277. Because the speech at issue in *DKT Memorial Fund* was "in other nations," it did not involve a right to receive information in the United States. (For the same reason, Plaintiffs cannot rely on the Supreme Court's recent opinion holding that the government may restrict the speech of "foreign organizations operating abroad." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2087 (2020).) Finally, Plaintiffs rely on *Humanitarian Law Project v. Reno*, 205 F.3d 1130 (9th Cir. 2000), which involved a prohibition against donating funds to terrorist organizations outside the United States, and on *Ibrahim v. Dep't of Homeland Security*, 669 F.3d 983 (9th Cir. 2012), which involved freedom of association rather than speech.

We hold that the Kazals' speech and speech-related activity—directed at and received by California residents— are excluded from the statute as protected under the First Amendment. We need not, and do not, here consider under what other circumstances a noncitizen living abroad has standing to claim the protections of the First Amendment.

B.  The Kazals' Speech and Speech-Related Conduct

The district court found that a reasonable jury could conclude that Tony and Adam Kazals' speech and speech-related conduct were a "true threat" and therefore not protected by the First Amendment.  On independent review of the constitutional facts, we conclude that their conduct did not constitute a true threat.  We therefore conclude that the Kazals' conduct was protected under the First Amendment and was "[c]onstitutionally protected activity" excluded from coverage under California's stalking statute.  Cal. Civ. Code § 1708.7(b)(1).

Setting aside its content for a moment, speech and speech-related conduct like that of the Kazals are ordinarily protected.  The Kazals hired protestors, organized leafletting, hired a van to drive around Los Angeles with a message on its side, and published emails online to "openly and vigorously [] mak[e] the public aware" of their views of David's business practices.  *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971).

The protections of the First Amendment are "nowhere stronger than in streets and parks," which are traditional public fora.  *Berger v. City of Seattle*, 569 F.3d 1029, 1035–36 (9th Cir. 2009) (en banc).  While a few isolated parts of the protest were non-speech conduct—such as when a protestor banged on the car of one of David's employees—this does not change the overall analysis.  *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 902, 933 (1982) (noting that "violent conduct is beyond the pale of constitutional protection" but the "ephemeral consequences of relatively few violent acts" do not render a protest unprotected).

In general, emails and tweets, when published on the "vast democratic forums of the Internet," fall squarely within the protection of the First Amendment. *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017) (citation omitted); *see also Reno v. Am. Civ. Liberties Union*, 521 U.S. 844, 851 (1997) (noting that an email is protected as "generally akin to a note or letter"). At some point, however, repeated unwanted communications can lose First Amendment protection. *See Rowan v. U.S. Post Off. Dep't*, 397 U.S. 728, 736 (1970) (stating that "the right of every person 'to be let alone' must be placed in the scales with the right of others to communicate"); *see also Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 542 & n.11 (1980) (noting that privacy interests are weaker where the recipient can easily "escape exposure" by discarding the communication). The record does not show that David ever asked the Kazals to stop sending the emails. Though David eventually configured a firewall to block his employees from receiving the emails, he did not block them from his own email inbox, preferring to preserve them for purposes of litigation. David testified that he did not read most of them. Under these circumstances, the emails come within the general protection of the First Amendment.

Though much of the Kazals' speech was intemperate and rancorous, including a reference to David's wife as "your hyena," the First Amendment right to receive information exists "regardless of [its] social worth." *Stanley*, 394 U.S. at 564; *accord Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 796 n.4 (2011) ("Crudely violent video games, tawdry TV shows, and cheap novels and magazines are no less forms of speech than The Divine Comedy."). However, speech is not protected if its content rises to the level of a "true threat." *See Watts v. United States*, 394 U.S. 705, 708 (1969) (per

curiam). True threats are "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals," though the speaker "need not actually intend to carry out the threat." *Virginia v. Black*, 538 U.S. 343, 359–60 (2003).

In determining whether speech is a true threat, we consider "the surrounding events and reaction of the listeners." *Planned Parenthood*, 290 F.3d at 1075 (quoting *United States v. Orozco-Santillan*, 903 F.2d 1262, 1265 (9th Cir. 1990)). Even a statement that appears to threaten violence may not be a true threat if the context indicates that it only expressed political opposition or was emotionally charged rhetoric. *See Watts*, 394 U.S. at 706–08 (statement "[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J." at a rally is protected); *Claiborne Hardware Co.*, 458 U.S. at 902, 928 (statement "[i]f we catch any of you going in any of them racist stores, we're gonna break your damn neck" at a rally is protected as "emotionally charged rhetoric"). Conversely, a statement that does not explicitly threaten violence may be a true threat where a speaker makes a statement against a known background of targeted violence. *See Black*, 538 U.S. at 360 (because of its history as a white-supremacist symbol, burning a cross is "often" a true threat); *Planned Parenthood*, 290 F.3d at 1085–86 ("Wanted" posters targeting doctors who performed abortions were true threats because both the speakers and the audience knew that the doctors in prior "Wanted" posters had been murdered).

Cases in this circuit have long employed an objective test for determining when speech is a "true threat." *See Roy v. United States*, 416 F.2d 874, 878 (9th Cir. 1969). Under this

test, we asked only "whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault." *Planned Parenthood*, 290 F.3d at 1074 (quoting *Orozco-Santillan*, 903 F.2d at 1265). But we interpreted the Supreme Court's above-quoted dictum in *Black*, which concerned criminal prosecutions for cross-burning, to overrule that precedent in criminal cases. *See United States v. Cassel*, 408 F.3d 622, 631 (9th Cir. 2005) (noting that *Black* defined true threats as when a speaker "means to communicate" serious intent). To uphold a conviction under any "threat statute that criminalize[s] pure speech," we require that the defendant subjectively intended to threaten. *United States v. Bagdasarian*, 652 F.3d 1113, 1117 (9th Cir. 2011). With respect to some (but not all) criminal statutes, we also require that the threat meet the objective standard. *Id.*

We have not yet determined whether the subjective test in *Black* applies in civil cases, or whether the objective test remains the sole test. In *Wynar v. Douglas County School District*, 728 F.3d 1062, 1070 & n.7 (9th Cir. 2013), we held that it did not matter for First Amendment purposes whether a student's repeated statements about planning a school shooting were true threats; the district was justified in suspending and expelling him whether they were or not. In *Fogel v. Collins*, 531 F.3d 824 (9th Cir. 2008), we held that, under either the objective or subjective test, police officers violated the First Amendment when they arrested Matthew Fogel and impounded his van because of his speech. We held that Fogel believed—as would any reasonable speaker—that his van with a huge sign stating (among other things) that he was a "SUICIDE BOMBER COMMUNIST TERRORIST" would be interpreted only as an "obviously satiric or

hyperbolic political message." *Id.* at 827, 831. As in *Fogel*, we need not decide here whether a true threat in civil cases requires both an objective threat and a subjective intent to threaten because Tony and Adam Kazal's speech does not satisfy either test.

The protests Tony organized in Los Angeles alerted the public to David's alleged misdeeds and encouraged people to "read the full story" on the Kazals' website. A reasonable speaker could not conclude that David would understand these communications to threaten anything more than a continuation of this campaign to provide their side of the story. Nor is there any evidence that Tony subjectively intended to threaten violence. Tony wrote in an email to his investigator that he intended to "screw with" David. In context, this did not show an "intent to commit an act of unlawful violence." *Black*, 538 U.S. at 359. While Tony's emails to David included rude language, they focused on "highlight[ing] the many crimes committed by [David]," including through "ongoing opportunities to deal with [David] in Court."

While events in the UAE and Australia cannot be part of a "pattern of conduct" under California law, they can provide context to assess whether the conduct in California was a "true threat." The context provided by these events does not elevate Tony Kazal's conduct to the level of a true threat. Tony's prior activity in the UAE and Australia largely consisted of angry emails, spurious embezzlement and immigration charges, and years of litigation. The man who stole David's cell phone and drove away with David on the hood of his car in Australia was not identified; David testified only that it was his "understanding" that the man was employed by Tony. David's wife's testimony that "two of

the Kazal brothers" followed David and a business associate in Sydney and "sw[ung] something in a threatening manner" is vague and unsubstantiated.

Both the objective and subjective tests yield the same conclusion: Tony's conduct did not constitute a "serious expression of intent to harm or assault." *See Planned Parenthood*, 290 F.3d at 1074 (quotations omitted).

Adam Kazal's conduct, while more confrontational than Tony's, also did not amount to a true threat under either test. David argues that statements in Adam's first email—"You start a fight with me, I will show you how Adam Kazal is different to the rest of the family" and "See you around grub"—were true threats. But the email nowhere threatened a physical attack, and Adam stated repeatedly in the email that his goal was "to expose [David] wherever [he goes]" and to "show the good people of LA what scum they have allowed into their city." Similarly, the tweet and attached screenshot threatened only to "expose you wherever you go!" In context, these communications suggested that Adam was "different to [sic] the rest of the family" in that he would pursue the information campaign more aggressively than did his brothers, but they did not threaten violence.

In an attempt to provide context in which to interpret the first email, David testified that Adam Kazal had "assaulted" his father in Australia in 2013, and he therefore believed that "[t]he next action was not going to be in words." But there is little information in the record about the nature of the "assault" in Australia. David testified that Adam "assaulted" his father repeatedly, suggesting that Adam's actions were something other than a physical attack. David's wife testified that Adam "accosted" and "assaulted" David's father, using

the words interchangeably, again implying something other than a physical attack. This ambiguous history did not provide sufficient basis for finding an implicit true threat in Adam's first email. It was not "reasonably foreseeable" to Adam that David would "seriously take his communication as an intent to inflict bodily harm." *Fogel*, 531 F.3d at 831. Nor is there evidence that Adam subjectively intended to threaten violence.

David also argues on appeal that Adam's second email, in response to the cease-and-desist letter, was extortionate and therefore not protected. In that email, quoted above, Adam demanded $666,666.66 for "Legal & Marketing, Pain and Disruption" costs to cease activities, or he "reserve[d] the right to . . . increase the size of [his] fleet" and do "whatever is necessary to expose the Corporate Fraudster[] Rodric David." But David did not make his extortion argument in the district court, and the jury was not instructed to determine whether Adam had an intent to extort. The dollar figure chosen—$666.666.66, invoking "the number of the beast"— strongly suggests that the demand was merely rhetorical.

We therefore conclude, on independent review under *Bose*, that Tony and Adam Kazal's speech and speech-related conduct did not fall into the exception for "true threats." Their conduct was protected under the First Amendment, and is therefore excluded from the "pattern of conduct" that constitutes stalking under California law. Cal. Civ. Code § 1708.7(b)(1), (a)(1).

## Conclusion

We hold that the First Amendment applies to Tony and Adam Kazal's speech and speech-related conduct in

California, and none of their conduct constituted a "true threat" outside the protection of the Amendment. Because Tony and Adam's conduct in California was "[c]onstitutionally protected activity" under California Civil Code § 1708.7(b)(1), there is no "pattern of conduct" that can support a judgment based on a violation of the California statute. We reverse and remand with instructions to set aside the judgment on Count Two.

**REVERSED and REMANDED.**

LEE, Circuit Judge, dissenting:

The First Amendment protects the good, the bad, and the ugly. As the defendants admit, their conduct bordered on the bad and unleashed the ugly. I largely agree with the majority's excellent opinion that the First Amendment protects even such reprehensible conduct. But I do not believe that the First Amendment—under its original public meaning—extends to foreigners who lack substantial voluntary connection to this country. The Kazal brothers apparently have no connection to the United States, and they should be unable to exploit the First Amendment as a shield and a sword against those who live here. I respectfully dissent.

## I. The Kazals Cannot Invoke the First Amendment's Protection.

As the majority ably points out, the Kazal brothers' conduct falls within the ambit of the First Amendment. But I do not believe that they can seek refuge in it because the

First Amendment does not extend to foreign aliens without substantial voluntary connections to the United States.

## A. The First Amendment does not extend to foreigners who lack "substantial connections" to the United States.

While the Constitution by its plain language does not appear to contemplate extraterritorial application,[1] the Supreme Court has recognized that American citizens are entitled to constitutional protections while abroad. *See Johnson v. Eisentrager*, 339 U.S. 763, 779 (1950). Conversely, foreign "aliens . . . within the United States may challenge the constitutionality of federal and state actions." *Ibrahim v. Department of Homeland Sec.*, 669 F.3d 983, 995 (9th Cir. 2012) (internal citations omitted). And foreign aliens who are in even de facto U.S. territory may be able to claim some constitutional protection in some cases. *See Boumediene v. Bush*, 553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008) (enemy aliens detained in an area over which the United States exercised de facto sovereignty may file habeas petitions).

But what about foreign citizens who do not reside in the United States and have only *de minimis* connection to the United States? The Supreme Court has held that a foreign national—at least in the Fourth Amendment context—must have some "voluntary attachment to the United States" to

---

[1] Sometimes, the Constitution's silence on an issue means only the survival of prior common law principles. *See* Stephen E. Sachs, Constitutional Backdrops, 80 *George Washington Law Review* 1813–1888 (2012) (describing extra-textual legal rules predating, and insulated by, the Constitution).

assert that constitutional right. *See United States v. Verdugo-Urquidez*, 494 U.S 259, 265–75, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990). In that case, DEA agents searched a Mexican national's homes in Mexico without a warrant and found incriminating evidence of his drug trafficking operation. The Supreme Court rejected the Mexican national's claim of a Fourth Amendment violation, focusing on the meaning of the phrase "the people" in the Fourth Amendment and other provisions of the Constitution. The Court held that the Constitution uses "the people" as a special "term of art," as reflected in the Preamble, the First Amendment, the Second Amendment, the Ninth Amendment, and the Tenth Amendment. *Id*. It concluded that "the people" refers "to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* The defendant there could not invoke the Fourth Amendment because he was not "part of a national community" and did not have "sufficient connection" to the United States to be considered a part of "the people." *See id.*

Consistent with *Verdugo-Urquidez*, a historical survey of the original public meaning of the term "the people" confirms that the First Amendment should not extend to foreigners who have no significant voluntary connection to the United States and thus are not "part of [the] national community." *See id.*

At the Founding, "the people" was not interchangeable with "persons." The Framers drew heavily on Enlightenment-era social compact theory and English common law: "the people" consent to be governed. As Alexander Hamilton put it, "the origin of all civil government, justly established, must be a voluntary

compact," and "no laws have any validity, or binding force, without the consent and approbation of the *people*." Alexander Hamilton, *The Farmer Refuted* (1775) (emphasis in original). Our Constitution thus uses the term "the people" in the First, Second, and Fourth Amendments to describe rights for individuals who have "sufficient connection" to the United States but uses the words "person" or "accused" for criminal procedural rights under the Fifth and Sixth Amendments. *Verdugo-Urquidez*, 494 U.S. at 265–66. So, too, with the Virginia Declaration of Rights, the predecessor to the Bill of Rights.[2]

At the Founding, two forms of social compact theory predominated and diverged along political lines. Federalists typically favored a strict contractual approach to the social

---

[2] The Virginia Declaration of Rights reflects the distinction between "the people" and "person[/s]" as used in the Constitution. It refers to "the people, community, and nation" as separate bodies, and "the people" is most often used to refer to the voting class. For instance, the Virginia Declaration uses "the people" to discuss electoral rights, powers, and representation, but, when discussing broader issues of sovereignty, the right to revolution, and the governed populace, it switches to the broader term, the "the community." *See* Section 3 ("when any government shall be found inadequate or contrary to these purposes, a majority of the community has an indubitable, inalienable, and indefeasible right to reform, alter, or abolish it, in such manner as shall be judged most conducive to the public weal"); Section 4 ("[t]hat no man, or set of men is entitled to exclusive or separate emoluments or privileges from the community"). *But see* Preamble ("A Declaration . . . made by the representatives of the good people of Virginia, assembled in full and free convention which rights do pertain to them and their posterity"). *See also Verdugo-Urquidez*, 494 U.S. at 265–266 (discussing the use of "the people" rather than "persons" or "the accused" in the Bill of Rights); *Parker v. Lovejoy*, 3 Mass. 565, 568, 2 Tyng 565, 568 (1795) (describing the Massachusetts Constitution as "an original compact, expressly, solemnly, and mutually made between the people and each citizen").

compact and a more cramped reading of "the people": Only persons who, by birth or naturalization, acquired citizenship received the benefits of the compact and thus could assert constitutional rights.[3]  During the debate over the Alien and Sedition Acts of 1798, the Federalists adopted the view that the "people" included only citizens.  *See Verdugo-Urquidez*, 494 U.S. at 267–69 (discussing the passage of laws and contemporary views in response to the Crisis of 1798).  *See also* 8 ANNALS OF CONG. 1984–85 (1798) ((remarks of Rep. William Gordon, a Federalist) (aliens not among those for whose use and benefit the Constitution was formed)).

James Madison and the contemporary Republicans, on the other hand, had a more expansive view of the social compact—and thus a broader meaning of "the people."  They advanced a territorial-based approach in which the primary inquiry was whether a person owed allegiance to the laws of the United States not only because of citizenship but also by location and activity.[4]  In response to the passage of the Alien

---

[3] The Federalist Papers often mention "the people" in the context of citizenship. *See, e.g.*, *Federalist No. 2* ("[t]o all general purposes we have uniformly been one people each individual citizen everywhere enjoying the same national rights, privileges, and protections"); *Federalist No. 57* ("[t]he electors are to be the great body of the people of the United States").

[4] In the 1798 debates, Madison and other Republicans argued that those passing through the United States owed temporarily allegiance, and thus had some constitutional protections. *See* Gerald L. Neuman, *Whose Constitution?*, 100 YALE L.J. 909, 934 (1991) (Madison wrote that it "is an acknowledged principle of the common law, the authority of which is established here, that alien friends . . . residing among us, are entitled to the protection of our laws, and that during their residence they owe a temporary allegiance to our Government.") (internal citations omitted). *See also id.* at 935 (noting that Madison argued that the due process clause

and Sedition Acts, Madison drafted the Virginia Resolution arguing against their constitutionality. He stated that it:

> does not follow, because aliens are not parties to the Constitution, as citizens are parties to it, that whilst they actually conform to it, they have no right to its protection. Aliens are not more parties to the laws than they are parties to the Constitution; yet it will not be disputed that, as they owe, on one hand, a temporary obedience, they are entitled, in return, to their protection and advantage. Madison's Report on the Virginia Resolutions, *reprinted in* 4 ELLIOT'S DEBATES at 556.

One thing is clear from the Founding era debates: An individual, at the very least, had to have some connection to the United States—whether it be presence on our soil or some form of implicit allegiance to this nation—to benefit from our constitutional rights. The Supreme Court over the decades has repeatedly reaffirmed this extra-territorial limitation to constitutional rights.[5] Just last year, the Supreme Court again

---

"literally reached aliens, by using in all places the term 'persons,' not 'natives'") (internal citations omitted).

[5] *See, e.g.*, *United States ex rel. Turner v. Williams*, 194 U.S. 279, 292, 24 S.Ct. 719, 48 L.Ed. 979 (1904) (holding that an excludable alien is not entitled to First Amendment rights, because '[h]e does not become one of the people to whom these thing are secured by our Constitution by an attempt to enter forbidden by law"); *Johnson v. Eisentrager*, 339 U.S. 763, 770 70 S.Ct. 936, 94 L.Ed. 1255 (1950) (recognizing that an alien "[is] accorded a generous and ascending scale of rights as he increases his identity with our society," but refusing to extend the Fifth Amendment to enemy aliens, captured in China and imprisoned in Germany); *Verdugo-Urquidez*, 494 U.S. at 265–75 (reiterating that "aliens receive

declared that "it is long settled as a matter of American constitutional law that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." *Agency For Int'l Development. v. Alliance for Open Society International, Inc.*, — U.S. —, 140 S.Ct. 2082, 2086, 207 L.Ed.2d 654 (2020) ("*AOSI II*").

Our court has extended *Verdugo-Urquidez*'s "voluntary connection" standard to the First Amendment's right of free association. In *Ibrahim v. Dep't of Homeland Sec.*, a Malaysian national studied for several years at Stanford on a student visa. 669 F.3d 983 (9th Cir. 2012). She eventually travelled to Malaysia to attend an academic conference and was prevented from returning to the United States because of her placement on the "No-Fly List." *Id.* at 987. She sued seeking injunctive relief under the First and Fifth Amendments to remove her name from the government's watchlists so that she might return to the United States. *See id.* We held that Ibrahim could assert constitutional claims because she had a "significant voluntary connection" to the United States. *Id.* at 996–97. This was so because, despite her departure to Malaysia, she spent four years studying at Stanford. *See id.* And her departure, the court found, "was to further, not to sever, her connection to the United States." *Id.* at 997.[6]

---

constitutional protections when they have come within the territory of the United States and developed substantial connections with this country").

[6] Our court in *Underwager v. Channel 9 Australia*, 69 F.3d 361, 365 (9th Cir. 1995) suggested that "the people" in the First Amendment refers to the freedom of assembly and right to petition the government only, and thus "there is no expressed limitation as to whom the right of free speech applies." But that language in *Underwager* appears to be dicta because the issue there was whether non-citizens residing *in the U.S.* are entitled

In sum, the original public meaning of "the people"—as used in the First Amendment and other provisions in the Constitution—underscores that an individual must have sufficient voluntary connection to the United States to assert those constitutional rights.

### B. The Kazals lack an adequate voluntary connection to the United States to invoke the First Amendment.

Nothing in the record suggests that the Kazals ever had *any* connection to the United States before waging their campaign against David. By their own admission, the brothers Kazal are residents of Australia and the United Arab Emirates, not the United States. They conduct no business in America, nor were they present here when they concocted their campaign and paid for the protests. In fact, it is not clear from the record if the Kazals have even ever set foot on American soil. For example, Adam Kazal testified that he has never visited California.

In their reply brief, the Kazals contend that their domestic speech to an American audience constitutes their "significant voluntary connection." But unlike the plaintiff in *Ibrahim*—

---

to the First Amendment protection. *Id.* at 365 ("We conclude that the speech protections of the First Amendment at a minimum apply to all persons legally within our borders."). Further, such a cramped interpretation limiting the application of "the people" to only the rights of assembly and to petition the government would be odd; for example, it would mean that the Establishment Clause applies even to foreigners who do not reside here and have no connections to the United States. Finally, I believe the Supreme Court's recent decision in *AOSI II* has undermined such a reading. 140 S.Ct. at 2086 ("foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution.").

who lived here and attended graduate school at Stanford—the Kazals had no connection to this country before paying for protests and roving vans. While it is true that an alien "[is] accorded a generous and ascending scale of rights as he increases his identity with our society," no court appears to have held that merely making payments abroad for speech in the United States entitles a foreign national to constitutional protections. *Eisentrager*, 339 U.S. at 770. Simply put, the allegedly protected activity by itself cannot constitute a "significant voluntary connection" to the United States.

Further, unlike the defendant in *Ibrahim*, the Kazals' actions suggest they wanted to "sever," not "further" their "connection to the United States. *Ibrahim*, 669 F.3d at 997. Ibrahim remained enrolled in an American university during her brief trip abroad to attend an academic conference. *See id.* at 986. As the Supreme Court in *Eisentrager* noted, an alien is "accorded a generous and ascending scale of rights as he increases his identity with our society." 339 U.S. at 770. As an academic at Stanford University, Ibrahim would have advanced her academic career in the United States by attending the conference overseas. Our court thus emphasized that Ibrahim's trip "was to further, not to sever, her connection to the United States." 669 F.3d at 986.

In contrast, the Kazals admit that their only connection to the United States was funding protests against David. They admit that their behavior was less then exemplary and did so perhaps because they had little to lose even if they were found to have violated our laws. Because they have no real connection to the United States, no American court could hold proceedings against them without their or their native land's cooperation, and they may even be effectively judgment-proof. In short, unlike domestic speakers, the

Kazals may evade obligations imposed by American law, while obtaining benefits provided under the First Amendment. *See U.S. ex rel. Turner v. Williams*, 194 U.S. at 292 (explaining that an alien "does not become one of the people to whom [First Amendment rights] are secured by our Constitution by [engaging in conduct] forbidden by law"). Even viewed most charitably, the Kazals' speech does not "further" even the most basic connection to the United States. Instead, it was a connection designed "to sever" itself. 669 F.3d at 986. Our precedent recognizes that there are some "aliens who may bring constitutional challenges," and some "who may not." *Ibrahim*, 669 F.3d at 995. The Kazal brothers cannot.[7]

The majority correctly points out that the government may run afoul of the First Amendment in restricting Americans' access to information, even when it flows from abroad. *See Lamont v. Postmaster Gen.*, 381 U.S. 301, 302, 305 (1965). *But see Kleindienst v. Mandel* 408 U.S. 753 (1972) (rejecting a First Amendment right-to-receive-information challenge to the facially valid exclusion of an immigrant under executive and legislative authority). *Lamont*, however, provides no comfort for the Kazals because they lack standing to assert an audience's right to receive information from abroad. A litigant "may only bring a claim on his own behalf, and may not raise claims based on the rights of another party." *Pony v. County of Los Angeles*, 433 F.3d 1138, 1146 (9th Cir. 2006); *Levine v. U.S. Dist.*

---

[7] A foreigner who lives abroad might still invoke the First Amendment in some cases. For example, a foreign journalist who has visited the United States or has written for publications with an American audience might have a sufficient voluntary connection.

*Court for Cent. Dist. Of Cal.*, 764 F.2d 590, 594 (9th Cir. 1985).

Finally, I appreciate and agree with the majority's point that the First Amendment does not extend to foreigners with no connections to the United States if it implicates national security concerns. Indeed, "[i]f the rule were otherwise, actions by American military, intelligence, and law enforcement personnel against foreign organizations or foreign citizens in foreign countries would be constrained by . . . purported rights under the U.S. Constitution. That has never been the law." *See AOSI II*, 140 S.Ct. at 2086–87. For example, a foreign operative living in Russia—or in Ukraine, North Korea, or a rogue state—could pay for or transmit propaganda aimed at stoking the fires of racial tension in America. Under the Kazals' extraterritorial view of our Constitution, that foreign operative could invoke the First Amendment and sue our government in our courts if our country acted to stop those malicious acts.

While this case does not involve national security issues, I still believe that—under the original public meaning of "the people"—foreign nationals cannot use the First Amendment's shield as a sword against us. "The distinction between citizens and aliens follows from the undoubted proposition that the Constitution does not create, nor do general principles of law create, any juridical relation between our country and some undefined, limitless class of noncitizens who are beyond our territory." *Verdugo-Urquidez*, 494 U.S. at 276 (Kennedy, J. concurring).

Although our Constitution serves as the inspiration for many freedoms enjoyed by people around the world, it does not guarantee these rights to foreigners outside our borders

who have no voluntary connection to the United States. Far from a defect, the overwhelming historical evidence suggests that this is by design. The Kazal brothers, who are in no way moored to the United States, cannot shield themselves under the cover of the First Amendment.

I respectfully dissent.