**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ISAIAS SANCHEZ GONZALEZ
and CELENIA YAQUELINE
GUTIERREZ,

       *Plaintiffs - Appellants*,

  v.

UNITED STATES DEPARTMENT
OF STATE; MARCO RUBIO,
United States Secretary of State, in
his official capacity; RAFAEL
FOLEY, United States Consul
General, Ciudad, Juarez, Mexico, in
his official capacity; UNITED
STATES DEPARTMENT OF
HOMELAND SECURITY;
MARKWAYNE MULLIN, Secretary
of the Department of Homeland
Security; UNITED STATES
CITIZENSHIP AND
IMMIGRATION SERVICES;
JOSEPH EDLOW, Director of U.S.
Citizenship and Immigration
Services,

       *Defendants - Appellees*.

No. 23-4205

D.C. No.
2:23-cv-00459-
PSG-PD

OPINION

Appeal from the United States District Court
for the Central District of California
Philip S. Gutierrez, District Judge, Presiding

Argued and Submitted December 18, 2025

Filed April 30, 2026

Before:  Sidney R. Thomas, Jay S. Bybee, and Kenneth K.
Lee, Circuit Judges.[*]

Opinion by Judge Bybee;
Concurrence by Judge Lee

## SUMMARY[**]

### Immigration

The panel affirmed the district court's dismissal of a suit in which Appellants Isaias Sanchez Gonzalez and Celenia Gutierrez challenged the government's decision to deny Sanchez's visa application.

---

[*] Judge Sandra S. Ikuta was originally a member of this panel.  Following her passing on December 7, 2025, Judge S.R. Thomas was drawn to replace her.  *See* Ninth Cir. Gen. Order 3.2.h.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Sanchez, a native of Mexico, entered the United States unlawfully in 1992, married Gutierrez, a U.S. citizen, and has three U.S. citizen children. Seeking to become a lawful permanent resident, Sanchez traveled to Mexico in 2015 for an interview with a consular officer. Consular staff determined there was reason to believe he was a member of a known criminal organization and denied the visa under 8 U.S.C. § 1182(a)(3)(A)(ii), which is known as "3A2," and renders inadmissible any "alien who a consular officer . . . knows, or has reasonable ground to believe, seeks to enter the United States to engage solely, principally, or incidentally in any . . . unlawful activity."

Under the doctrine of consular nonreviewability, federal courts cannot review a consular officer's denial of a visa. However, in *Kleindienst v. Mandel,* 408 U.S. 753 (1972), the Supreme Court recognized a narrow exception when the visa denial allegedly burdens the constitutional rights of a U.S. citizen. Here, Appellants argued that they possessed First Amendment interests sufficient to trigger the *Mandel* exception.

The panel held that Sanchez, as a noncitizen seeking admission, could not invoke the *Mandel* exception in reliance on his own First Amendment rights. The panel rejected Sanchez's argument that his substantial connections to the United States allowed him to bring a First Amendment challenge.

However, the panel held that the visa denial implicated the First Amendment right of Gutierrez, as a U.S. citizen, to hear Sanchez's speech and thus triggered the *Mandel* exception. The panel held that *Dep't of State v. Muñoz*, 602 U.S. 899 (2024)—which held that a citizen does not have a fundamental liberty interest in her noncitizen spouse being

admitted to the country and thus lacks a procedural due process right to trigger *Mandel*—did not abrogate *Mandel*'s holding that limited review is available where a visa denial implicates the First Amendment rights of a U.S. citizen.

Conducting the limited review permissible under Supreme Court precedent, the panel held that the government here had shown a facially legitimate and bona fide reason for the denial because the consular officer cited 3A2 and concluded that there was "reason to believe" Sanchez is a member of a criminal organization after reviewing interview statements, law-enforcement information, the immigration record, and all other submissions. The panel also rejected Appellants' argument that the denial was based "solely" on Sanchez's tattoos, which are a form of protected speech under the First Amendment, concluding that Appellants had not shown that the visa denial was based solely on the tattoos.

Next, the panel held that Appellants had not carried their burden of proving that the reason for the denial was not bona fide by making an affirmative showing of bad faith on the part of the consular officer who denied a visa. At most, Sanchez had alleged that the consular officer incorrectly concluded that he was a member of a criminal organization, but that, without more, did not qualify as bad faith.

Finally, the panel rejected Appellants' claim that 3A2 is unconstitutionally vague as applied. Here, the consular officer denied the visa on the rationale that Sanchez was likely a member of a criminal organization. The panel concluded that a person of average intelligence would reasonably understand that such conduct would imply engagement in unlawful activity and thus render him

ineligible for entry under 3A2. The panel also rejected Appellants' argument that 3A2 is standardless.

Concurring in the judgment, Judge Lee wrote that this appeal was a fruitless end-run attempt around *Muñoz* because the facts of the cases are virtually identical and both cases essentially assert a substantive due process right to demand entry of a foreign national spouse into the United States but have dressed up that claim under the garb of another constitutional right. Judge Lee wrote that he fears that the majority's creation of a new expansive First Amendment exception—the right to speak with a foreign national spouse within our borders—could gut the consular nonreviewability doctrine and allow courts to meddle with the Executive Branch's plenary power to determine who may be admitted into the country.

## COUNSEL

Eric T. Lee (argued) and Alan R. Diamante, Diamante Law Group APLC, Southfield, Michigan; G.S. Hans, Angelina Leach, Nathanael Lo, Deborah Morales, and Ifrah Qadir, Civil Rights and Civil Liberties Clinic, Cornell Law School, Ithaca, New York; for Plaintiffs-Appellants.

Caroline McGuire (argued) and Erin T. Ryan, Trial Attorneys; Alexander J. Halaska, Senior Litigation Counsel; Erez Reuveni, Assistant Director; Office of Immigration Litigation; Brian M. Boynton, Principal Deputy Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; Jasmin Yang, Attorney, Office of the United States Attorney, United States Department of Justice, Los Angeles, California; for Defendants-Appellees.

**OPINION**

BYBEE, J., Circuit Judge:

Appellants Isaias Sanchez Gonzalez and Celenia Gutierrez, a married couple, challenge the government's decision to deny Sanchez's visa application under 8 U.S.C. § 1182(a)(3)(A).  Sanchez is a native of Mexico who entered the United States unlawfully in 1992, and Gutierrez is a U.S. citizen.  To comply with the process for becoming a lawful permanent resident, Sanchez traveled to Mexico in 2015 for an interview with a consular officer.  Following the interview, the government determined that Sanchez was inadmissible because there was reason to believe he was a member of a known criminal organization.

Sanchez and Gutierrez brought suit in federal district court, alleging that the inadmissibility determination was based solely on Sanchez's tattoos.  Among other claims, they argued that the government had violated the First Amendment rights of both spouses and that 8 U.S.C. § 1182(a)(3)(A) is void for vagueness.  The district court dismissed the claims, holding that Sanchez, as a noncitizen, could not overcome the doctrine of consular nonreviewability, while Gutierrez had not plausibly alleged that the government lacked a facially legitimate and bona fide reason for its inadmissibility determination.  The court additionally concluded that 8 U.S.C. § 1182(a)(3)(A) is not unconstitutionally vague.  We affirm.

## I.   BACKGROUND

A. *Statutory Background*

A foreign national seeking a visa based on a familial relationship with a U.S. citizen must complete a process

prescribed by the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.* First, the U.S. citizen must file a Form I-130 (Petition for Alien Relative) with U.S. Citizenship and Immigration Services (USCIS) and seek to have the noncitizen classified as an immediate relative. *See* 8 U.S.C. § 1154(a)(1); 8 C.F.R. §§ 204.2(a)(2), (d)(2). If the Form I-130 petition is approved, the noncitizen may submit a visa application. As part of the application process, the noncitizen will eventually need to appear for an in-person interview with a consular officer. 8 U.S.C. §§ 1201(a), 1202(a)–(h).

Under the INA, "[n]o visa shall be issued to an alien if . . . it appears to the consular officer . . . that such alien is ineligible to receive a visa . . . under section 1182 of this title, or any other provision of law," or if "the consular officer knows or has reason to believe that [the] alien is ineligible to receive a visa . . . under section 1182." 8 U.S.C. § 1201(g); *see also* 22 C.F.R. § 40.6. Section 1182 of the INA, in turn, identifies various "[c]lasses of aliens ineligible for visas or admission" to the United States. Section 1182(a)(3)(A)(ii), the primary subsection at issue in this case and commonly referred to as "3A2," renders inadmissible "[a]ny alien who a consular officer or the Attorney General knows, or has reasonable ground to believe, seeks to enter the United States to engage solely, principally, or incidentally in any . . . unlawful activity."

## B. *Factual and Procedural Background*

Sanchez is a native and citizen of Mexico who first entered the United States unlawfully in 1992, at age fifteen. He is married to Gutierrez, a U.S. citizen, with whom he has three U.S. citizen children. While residing in the United States, Sanchez acquired various tattoos: the names of his

sons; his initials; a tribal image; images of a woman, theatrical masks, and a joker and clown; the words "Aztec Pride" alongside an Aztec Pyramid and Aztec Sun; a dove with the date of his father's death; the letters "L.A."; and Catholic symbols, including a cross and a rosary.

In 2015, Sanchez began the application process for lawful permanent residency. Sanchez filed an unlawful presence waiver, while Gutierrez filed a Form I-130 on Sanchez's behalf. USCIS approved Sanchez's waiver in July 2015 after determining that Gutierrez would suffer "extreme hardship" if separated from her husband or if forced to relocate to Mexico. As the final step in the application process, Sanchez traveled to Ciudad Juarez, Mexico in January 2016 for an in-person interview with a consular officer at the U.S. Embassy. Sanchez alleges that during the interview, the consular officer asked him a series of questions about his tattoos and told him that he should have them removed. Sanchez's complaint states that "[t]here was no other reference in the interview to anything related to potential criminal activity or gang membership." Sanchez also alleges that he has never had any interaction with any law enforcement. The government does not dispute that Sanchez has no criminal or arrest record.

Following the interview, the consular officer refused Sanchez's visa application—first that same day, and again sixteen months later upon the completion of administrative processing. In May 2017, consular staff issued a denial notice stating that Sanchez was ineligible for an immigrant visa under 3A2 "as an alien for whom there is reason to believe is a member of a known criminal organization." "In making the decision," the notice said, "the consular officer reviewed all evidence available, including Mr. Sanchez's statements made during the visa interview, information

provided by law enforcement, the immigration record, and all documents submitted." The notice also stated that the decision was reviewed by a superior and was in accordance with an advisory opinion from the Department of State's Visa Office. Despite affidavits submitted on Sanchez's behalf by gang experts who disclaimed any known relationship between Sanchez's tattoos and gangs, the government maintained that his "ineligibility under INA 212(a)(3)(A)(ii) stands," rendering Sanchez "permanently ineligible for a visa." Subsequent communications from the government did not elaborate on the consular officer's reasoning and merely averred that whether Sanchez was "a member of an organized criminal entity is a factual determination that only a consular officer has the authority to make." The communication concluded that it found "no legal error in the consular officer's determination of ineligibility," but invited Sanchez's counsel to provide any new factual evidence he wished.

Sanchez and Gutierrez filed suit in federal district court, asserting, among other claims, that the visa denial violated their First Amendment rights and that, alternatively, 3A2 is unconstitutionally vague as applied. The district court granted the government's 12(b)(6) motion and dismissed the case, finding that that Appellants could not successfully invoke the exception to the "doctrine of consular nonreviewability" and that 3A2 was not void for vagueness. This appeal followed.

## II.    STANDARD OF REVIEW

"We review de novo the district court's grant of a motion to dismiss under Rule 12(b)(6), accepting all factual allegations in the complaint as true and construing them in the light most favorable to the nonmoving party." *Skilstaf,*

*Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1014 (9th Cir. 2012).  A complaint survives a motion to dismiss if it states a claim for relief that is "plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III.  DISCUSSION

### A.  *Consular Nonreviewability*

"For more than a century, [the Supreme Court] has recognized that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'"  *Dep't of State v. Muñoz*, 602 U.S. 899, 907 (2024) (citations omitted).  When Congress "delegate[s] to executive officials the discretionary authority to admit noncitizens," as it has with the INA, the executive officer's decision "is final and conclusive."  *Id.* at 907–08 (quoting *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950)).  And because the INA "does not authorize judicial review of a consular officer's denial of a visa[,] . . . as a rule, the federal courts cannot review those decisions.  This principle is known as the doctrine of consular nonreviewability."  *Id.* at 908.

The Supreme Court has recognized "a narrow exception" to the doctrine of consular nonreviewability "when the denial of a visa allegedly burdens the constitutional rights of a U.S. citizen."  *Id.* (quoting *Trump v. Hawaii*, 585 U.S. 667, 703 (2018)).  This exception is born from *Kleindienst v. Mandel*, 408 U.S. 753 (1972), where the Court "engaged in a circumscribed judicial inquiry" to determine if the government had denied admission to Belgian journalist Ernest Mandel on the basis of a "facially legitimate and bona fide reason."  *Hawaii*, 585 U.S. at 703 (quoting *Mandel*, 408 U.S. at 770).  In that case, Mandel and several U.S. citizen

professors challenged the Attorney General's decision to deny Mandel admission to speak at a conference. Although the Court held that "Mandel personally, as an unadmitted and nonresident alien, had no constitutional right of entry to this country," it found that the denial implicated the professors' First Amendment "right to receive information" and thus warranted some form of limited review. *Mandel*, 408 U.S. at 762–63 (citation omitted). The Court ultimately held that the Attorney General's proffered reason for exclusion—engagement in activities beyond the scope of prior visas—was facially legitimate and bona fide, though it did not expound on the appropriate inquiry should the government fail at this threshold step. *See id.* at 758, 770 ("What First Amendment or other grounds may be available for attacking exercise of discretion for which no justification whatsoever is advanced is a question we neither address nor decide in this case.").

Appellants argue that (1) Sanchez possesses a First Amendment interest sufficient to trigger the *Mandel* exception to the consular nonreviewability doctrine; (2) Gutierrez has a separate First Amendment "right to hear" implicated by the visa denial; (3) the denial was based on Sanchez's tattoos and thus fails the "facially legitimate and bona fide test"; and (4) even if facially legitimate, the visa denial was issued in bad faith. We address each argument in turn.

1. Sanchez's First Amendment Rights

Sanchez argues that he possesses substantial connections to the United States that allow him to bring a First Amendment challenge to the government's inadmissibility determination. We disagree.

As a general matter, noncitizens located outside the United States have no rights under the U.S. Constitution. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 433 (2020).  Nevertheless, this rule is not absolute: "[T]he border of the United States is not a clear line that separates aliens who may bring constitutional challenges from those who may not."  *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 995 (9th Cir. 2012).  The Supreme Court has also held that an alien is "accorded a generous and ascending scale of rights as he increases his identity with our society."  *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950).  As such, "once an alien gains admission to our country and begins to develop the ties that go with permanent residence[,] his constitutional status changes."  *Landon v. Plasencia*, 459 U.S. 21, 32 (1982); *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) ("[A]liens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country.").

But in the context of noncitizens seeking entry into the United States, the Court *has* drawn a clear line between lawful residents and those who have never been lawfully admitted.  *See Kerry v. Din*, 576 U.S. 86, 88 (2015) ("[A]n unadmitted and nonresident alien . . . has no right of entry into the United States, and no cause of action to press in furtherance of his claim for admission.").  For aliens seeking initial, lawful entry into the United States, the Constitution provides no basis for challenging the government's plenary authority to exclude them.  *See Landon*, 459 U.S. at 32 ("This Court has long held that an alien seeking *initial admission* to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative."

(emphasis added)).  Relying on this principle, we wrote in *Khachatryan v. Blinken* that when "the denial of a visa to an unadmitted and nonresident alien is at issue, the exception to consular reviewability involving constitutional claims only applies 'when the denial of a visa allegedly burdens the constitutional rights *of a U.S. citizen*.'"  4 F.4th 841, 850 (9th Cir. 2021) (quoting *Hawaii*, 585 U.S. at 703).

Sanchez, as a noncitizen seeking admission from outside the United States, cannot invoke the *Mandel* exception in reliance on his own First Amendment rights.  *Khachatryan* makes clear that only U.S. citizens may mount constitutional challenges to the consular nonreviewability doctrine.  Sanchez nevertheless attempts to distinguish *Khachatryan* on the basis of his "substantial connections" to the United States, emphasizing that the plaintiff there was a noncitizen who had never stepped foot on our soil.  We understand that Sanchez has resided in the United States since he was fifteen, that he is married to a U.S. citizen and has three U.S. citizen children, and that he only left the country to comply with the INA's prescribed process for obtaining legal status.  But regardless of the roots Sanchez has planted here, the "substantial connections" principle has never been extended to provide a constitutional claim to reentry to those who unlawfully entered the United States.  Indeed, the cases Sanchez cites for this theory discuss the rights of *lawful* resident aliens.  *E.g.*, *Landon*, 459 U.S. at 32–34 (holding that a lawful resident alien was entitled to a due process hearing after being denied entry following a brief trip abroad); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 601–03 (1953) (same).  As a noncitizen who never obtained lawful admission, Sanchez stands on different ground.  *Cf. Kwong Hai Chew*, 344 U.S. at 596 n.5 ("The Bill of Rights is a futile authority for the alien seeking admission for the first time to

these shores.  But once an alien *lawfully* enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders." (emphasis added) (citation omitted)).

Our decision in *Ibrahim*, which Sanchez relies on most heavily in support of his "substantial connections" argument, points to the same conclusion.  There, we held that a lawful U.S. resident denied re-entry could assert claims under the First and Fifth Amendments on account of her "significant voluntary connection" with the United States.  *Ibrahim*, 669 F.3d at 997 (citing *Verdugo-Urquidez*, 494 U.S. at 271, and *Boumediene v. Bush*, 553 U.S. 723, 764 (2008)).  As in *Landon* and *Kwong Hai Chew*, the substantial connections that "invested" Ibrahim with rights under the Constitution stemmed from her prior lawful admission to the United States.  *See Landon*, 459 U.S. at 32; *Kwong Hai Chew*, 344 U.S. at 593–95.   And unlike Sanchez, Ibrahim was challenging the "placement of [her] name on the government's terrorist watchlists" and not "the revocation of her visa, as decisions of consular officers to deny a visa are immune from judicial review."  *Ibrahim*, 669 F.3d at 993–94.  Indeed, Sanchez's claim finds no support in *Ibrahim*, as we noted that "Ibrahim's future ability to obtain a visa is uncertain and we would be powerless to review a denial." *Id.* at 993.   In sum, *Ibrahim* does not provide the relief Sanchez seeks.  We are not aware of any case that has disturbed the foundational rule that "an unadmitted and nonresident" alien has "no constitutional right of entry." *Mandel*, 408 U.S. at 762.

### 2.  Gutierrez's First Amendment Rights

Appellants also argue that Sanchez's visa denial implicates Gutierrez's First Amendment right to receive

information.  As Gutierrez is a U.S. citizen, she claims that *Mandel* is directly applicable and allows limited review into whether the government provided a "facially legitimate bona fide reason" for denying Sanchez's application.  *See Mandel*, 408 U.S. at 770.  We agree.

The government's rebuttal primarily relies on the Supreme Court's recent decision in *Muñoz*, where it held that "a citizen does not have a fundamental liberty interest in her noncitizen spouse being admitted to the country" and thus lacks a "*procedural due process right* to a 'facially legitimate and bona fide reason' for why someone else's visa was denied."  602 U.S. at 909, 919 (emphasis added).  The government reads *Muñoz* as precluding U.S. citizens from asserting First Amendment claims to challenge the denial of a noncitizen spouse's visa application.  In doing so, the government suggests that *Muñoz sub silentio* overruled *Mandel*—an overreading not supported by that opinion.

In *Muñoz*, a U.S. citizen challenged the denial of her husband's immigrant visa application on the grounds that it "abridged her fundamental right to live with her spouse in her country of citizenship—and that it did so without affording her the fair procedure guaranteed by the Fifth Amendment."  602 U.S. at 909.  The Court rejected this claim, noting "the Government's sovereign authority to set the terms governing the admission and exclusion of noncitizens" and stating that Muñoz could not identify any "tradition that curbs this authority in the case of noncitizen spouses."  *Id.* at 912.  But the Court was careful to distinguish and preserve *Mandel*, emphasizing that the professors in that case "argued that the denial of Mandel's visa directly deprived them of their First Amendment rights, *not* that their First Amendment rights entitled them to

procedural protections in Mandel's visa application process." *Id.* at 918.

Like *Mandel*, this case has "nothing to do with procedural due process." *See id.* Although at first blush the facts in *Muñoz* may seem similar to the facts here, the legal claims are quite distinct. While Muñoz claimed a "[due process] right *to reside with her noncitizen spouse in the United States*," 602 U.S. at 910, Gutierrez relies on her First Amendment right to hear a noncitizen's speech in person— the precise right that *Mandel* recognized as triggering an exception to the consular nonreviewability doctrine. *See Mandel*, 408 U.S. at 764–65; *see also Hawaii*, 585 U.S. at 703 ("[The *Mandel* Court] acknowledged that [the professors'] constitutional 'right to receive information' was implicated." (citation omitted)). At no point in *Muñoz* did the U.S. citizen spouse claim that she had a First Amendment right to hear her husband's speech. As the Court was tasked only with evaluating her procedural due process challenge, its "bottom line" in *Muñoz* was merely "that procedural due process is an odd vehicle for Muñoz's argument, and *Mandel* does not support it." 602 U.S. at 919. *Mandel*'s central holding—that the government must offer a facially legitimate and bona fide reason when its inadmissibility determination implicates a U.S. citizen's First Amendment rights—remains good law.

Gutierrez asserted a right to hear her noncitizen husband's speech. The fact that Sanchez's speech is not likely to bear on core political speech does not change the analysis. *Mandel* may have involved political speech, but the Court has never cabined the applicability of the *Mandel* exception based on the content of the speech implicated. *Mandel* itself emphasized that although "[t]he ideas of most [] aliens might not be so influential as those of Mandel, nor

his American audience so numerous, nor the planned discussion forums so impressive[,] . . . the First Amendment does not protect only the articulate, the well known, and the popular." 408 U.S. at 768. Stressing that the First Amendment does not discriminate based on the "probity of the speaker's ideas," the Court acknowledged that "[i]n almost every instance of an alien excludable under § 212(a)(28), there are probably those who would wish to meet and speak with him." *Id.* at 768–69. But the proper limiting principle, as the Court applied in *Mandel*, is the judiciary's deference to the government's bona fide and facially legitimate reason. *See id.* at 768.

This understanding of the right to receive information in *Mandel* aligns with broader First Amendment jurisprudence. *See Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("This right to receive information and ideas, *regardless of their social worth*, is fundamental to our free society." (emphasis added) (internal citation omitted)). Indeed, we have held that speech by noncitizens abroad implicates the First Amendment when the recipients of the speech are located within our borders, even when the information being exchanged concerns personal grievances, rather than political matters. *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 743–44 (9th Cir. 2021) (holding that "the right to receive information from outside the United States" protects the airing of information about a private business dispute). In sum, neither *Mandel* nor our body of First Amendment caselaw draws distinctions based on political speech.

We thus hold that the Department of State's visa denial implicated Gutierrez's First Amendment rights and triggers the *Mandel* exception. The Court's decision in *Muñoz* was limited to the procedural due process context and has no impact on *Mandel*'s reach. To conclude otherwise would

create the peculiar rule that *Mandel* applies *except* where the plaintiff is married to the unadmitted alien, counterintuitively suggesting that a U.S. citizen's First Amendment challenge to her spouse's visa denial would stand on stronger ground if she were a professor or some other mere acquaintance.

    3.    Facially Legitimate and Bona Fide

That we may conduct a limited review of the consular officer's inadmissibility decision does not mark the end of the road. We must still determine if the government has proffered a facially legitimate and bona fide reason for denying Sanchez's visa application. Although *Mandel* did not provide meaningful guidance on how to apply this standard, we have concluded that Justice Kennedy's concurrence in *Din*, 576 U.S. at 101–107, is the controlling opinion and prescribes a two-part test. *Cardenas v. United States*, 826 F.3d 1164, 1171–72 (9th Cir. 2016).

To satisfy part one, "the consular officer must deny the visa under a valid statute of inadmissibility." *Id.* at 1172 (citing *Din*, 576 U.S. at 104 (Kennedy, J., concurring in the judgment)). Part two requires that either "the consular officer . . . cite an admissibility statute that specifies discrete factual predicates the consular officer must find to exist before denying a visa," or "there [is] a fact in the record that provides at least a facial connection to the statutory ground of inadmissibility." *Id.* (citation modified). If "the government has made that showing, the plaintiff has the burden of proving that the reason was not bona fide by making an affirmative showing of bad faith on the part of the consular officer who denied a visa." *Id.* (citation modified). In *Cardenas*, we held that the government satisfied the two-part test because it cited Section 3A2 and offered "a bona

fide factual reason that provided a 'facial connection' to the statutory ground of inadmissibility: the belief that [the unadmitted alien] was a 'gang associate' with ties to the Sureno gang." *Id.*

The government has likewise made the requisite showings here. First, as in *Cardenas*, the consular officer denied Sanchez admission under 3A2, which is a valid statute of inadmissibility that allows consular officers to bar those they reasonably believe are seeking to enter the United States for unlawful activities. *See* 8 U.S.C. § 1182(a)(3)(A)(ii). Second, the consular officer's belief that Sanchez is a member of a known criminal organization is sufficient to establish a facial connection to the statutory ground in question. *See Cardenas*, 576 U.S. at 1172. The consular officer supported this belief with "all evidence available," including Sanchez's "statements made during the visa interview, information provided by law enforcement, the immigration record, and all documents submitted." Although these offer only the barest of explanations and do not elaborate on the facts underlying that explanation, they satisfy *Mandel*'s "facially legitimate and bona fide reason" standard, as qualified in *Din*.

Appellants argue that the denial was not facially legitimate and bona fide because it was based "solely" on Sanchez's tattoos, which are a form of protected speech under the First Amendment. *See Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1059–64 (9th Cir. 2010) (stating that tattoos are "purely expressive" speech entitled to "full First Amendment protection"). They claim that the existence of less restrictive means to enforce 3A2 prohibits the government's proffered reason.

But Appellants have not demonstrated that the consular officer's inadmissibility determination was based solely on Sanchez's tattoos.  The notice of denial sent to Sanchez does not refer to tattoos at all, instead stating that the officer "reviewed all evidence available, including Mr. Sanchez's statements made during the visa interview, information provided by law enforcement, the immigration record, and all documents submitted," and determined that there was "reason to believe" that Sanchez was a member of a criminal organization.

At no point has the government conceded that Sanchez's tattoos played any role in the visa denial.  Appellants would like us to assume that the tattoos were the true justification due to Sanchez's lack of a criminal record and the consular officer's alleged focus on his tattoos during the interview. But we are not privy to the full breadth of information available to the officer, as "information provided by law enforcement" can encompass details not located in a formal record.  For us to delve further into the particulars of the officer's investigation would subvert the purpose of the facially legitimate and bona fide standard—a standard that affords even more deference to the government than rational basis review.  *See Hawaii*, 585 U.S. at 704–05.

In sum, the consular officer cited 3A2 and concluded that there was "reason to believe" Sanchez is a member of a criminal organization after reviewing interview statements, law-enforcement information, the immigration record, and all other submissions.  For the purposes of our limited inquiry, the government has proffered a facially legitimate and bona fide reason.

4. Bad Faith

As the government has satisfied the *Din* test, Appellants bear "the burden of proving that the reason was not bona fide by making an affirmative showing of bad faith on the part of the consular officer who denied [Sanchez] a visa." *Cardenas*, 826 F.3d at 1172 (citation modified) (quoting *Din*, 576 U.S. at 105 (Kennedy, J., concurring in the judgment)). To do so, Appellants must "affirmatively allege facts with sufficient particularity to raise a plausible inference that the consular officer acted in bad faith." *Khachatryan*, 4 F.4th at 852 (citation modified). We have previously "construed this requirement as imposing a burden to allege *subjective* 'bad faith,' *i.e.*, that 'the consular official did not in good faith *believe* the information he [or she] had' or that the 'Consulate acted upon information it *knew* to be false.'" *Id.* (quoting *Bustamante v. Mukasey*, 531 F.3d 1059,1062–63 (9th Cir. 2008)). It "is not enough to allege that the consular official's information was incorrect." *Bustamante*, 531 F.3d at 1062–63.

Although we require evidence of *subjective* bad faith, the *objective* reasonableness of the consular officer's stated basis may be relevant to our inquiry. *Khachatryan*, 4 F.4th at 853 ("[T]he more objectively unreasonable a stated basis for denying a visa is, the more plausible is the inference that the consular officer who accepted it acted in subjective bad faith."). In *Khachatryan*, we held that a consular officer acted in bad faith where he persistently refused to accept the contrary conclusions of another agency and repeatedly mischaracterized the denied applicant's visa history. *Id.* at 853–54. Although this case presents some troubling allegations, there is not enough to conclude that the consular officer's visa denial, which was reviewed by both a supervisor and the Department of State's Visa Office, was

made in bad faith.  Appellants again point to the officer's alleged focus on Sanchez's tattoos during the interview, the government's failure to identify a specific gang to which Sanchez belongs, and Sanchez's lack of a prior criminal record.  Greater detail about the basis for the consular officer's determination would have satisfied our native curiosity, but Appellants have offered no direct evidence that the officer ignored contrary findings or relied on clearly erroneous facts, and we have no license to require further explanation from the State Department.  For us to demand greater explanation would improperly interfere with the consular officer's discretion over visa denials and subvert the design of the consular nonreviewability doctrine.  *See Din*, 576 U.S. at 106 (Kennedy, J., concurring in the judgement) ("Under *Mandel,* respect for the political branches' broad power over the creation and administration of the immigration system extends to determinations of how much information the Government is obliged to disclose about a consular officer's denial of a visa to an alien abroad.").  At most, Sanchez has alleged that the consular officer incorrectly concluded that he was a member of a criminal organization.  But that, without more, does not qualify as bad faith.

## B.  *Void-for-Vagueness*

Finally, Appellants claim that 3A2 is unconstitutionally vague as applied.  A criminal law is unconstitutionally vague if "it fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).  The Supreme Court has extended this principle to the immigration context, *Sessions v. Dimaya*, 584 U.S. 148, 156–57 (2018), and we have applied the void-for-vagueness doctrine to challenges involving grounds of inadmissibility,

*Martinez-de Ryan v. Whitaker*, 909 F.3d 247, 251 (9th Cir. 2018).

We have previously anchored our analysis of as-applied vagueness challenges to the conduct *allegedly* being punished, regardless of any factual disputes. *See Kashem v. Barr*, 941 F.3d 358, 364 n.1 (9th Cir. 2019) (analyzing vagueness with respect to the "specific conduct" alleged by the government, despite the plaintiffs "vigorously disput[ing]" that they posed a threat of such conduct). And to ensure that Appellants' void-for-vagueness challenge does not circumvent the consular nonreviewability doctrine, we must analyze 3A2 as applied to the conduct the government has identified as the basis for its inadmissibility determination. Here, the consular officer expressly denied Sanchez's visa application on the rationale that he was likely a member of a criminal organization. A "person of average intelligence would reasonably understand" that such conduct would imply engagement in unlawful activity and thus render him ineligible for entry under 3A2. *See United States v. Williams*, 441 F.3d 716, 724 (9th Cir. 2006); *see also Kashem*, 941 F.3d at 373.

Appellants also argue that 3A2 is "standardless" because "it invites arbitrary enforcement by unaccountable consular officers who have free reign to interpret the statute however they see fit." Although the Due Process Clause is violated when "inherently vague statutory language permits such selective law enforcement," *Smith v. Goguen*, 415 U.S. 566, 576 (1974), 3A2 contains a limiting principle. Specifically, 3A2's requirement that an officer must "know[], or ha[ve] reasonable ground to believe" that an applicant seeks to enter the United States to engage in unlawful activity serves as a "neutral limitation[] on the conduct of individual [consular] officers." *Kashem*, 941 F.3d at 374 (citation omitted)

(holding that the reasonable suspicion standard for inclusion on the No Fly List sufficiently constrained officer discretion).  Although we also emphasized in *Kashem* that agencies nominating individuals for inclusion on the No Fly List had to rely on "articulable intelligence" to meet the reasonable suspicion standard, *id.* at 374, the consular nonreviewability doctrine gives the government greater latitude over what it must disclose regarding admissibility determinations.  *See Din*, 576 U.S. at 106 (Kennedy, J., concurring in the judgment).  And here, the consular officer identified the sources for his decision in referring to statements made during the interview, information from law enforcement, the immigration record, and all documents submitted.  As applied to Sanchez, 3A2 did not authorize a standard that amounted to "mere guesses or hunches." *Kashem*, 941 F.3d at 374 (internal quotation marks omitted).

## IV.   CONCLUSION

We are sympathetic that Sanchez, in attempting to follow the rules for becoming a lawful permanent resident, has been excluded from the country he has built a life in since the age of fifteen.  But we are bound to follow the law.  And the law is clear that decisions by consular officers are ordinarily nonreviewable, and that noncitizens cannot evade the consular nonreviewability doctrine by asserting their own constitutional rights.

The government, however, goes too far in contending that the Supreme Court's decision in *Muñoz* bars Gutierrez from claiming that the denial of her husband's visa violated her own First Amendment right to hear his speech.  *Muñoz* did not abrogate *Mandel*'s holding that limited review is available where a visa denial implicates the First Amendment rights of a U.S. citizen.  We thus hold that

*Mandel* remains good law, permitting our limited review of Gutierrez's First Amendment challenge.  Nevertheless, we also conclude that the government has offered a facially legitimate and bona fide justification for denying Sanchez's visa and that Appellants have not carried their burden of demonstrating that the consular officer acted in bad faith. Finally, we hold that 3A2 is not unconstitutionally vague as applied.

The district court's judgment is AFFIRMED.

---

LEE, Circuit Judge, concurring in judgment:

This appeal is a fanciful—and fruitless—end-run attempt around *Dep't of State v. Muñoz*, 602 U.S. 899 (2024). In that recent opinion, the Supreme Court reaffirmed the sweeping scope of the consular nonreviewability doctrine, which generally bars judicial review of visa denials.  In doing so, the Court held that U.S. citizens have no substantive or procedural due process right to be reunited with a foreign national spouse in the United States.  The facts here are virtually identical to those in *Muñoz*: In both cases, a U.S. citizen's foreign national spouse was denied entry into our country because of suspected gang ties.  And the legal issues are basically the same, too: Both essentially assert a substantive due process right to demand entry of a foreign national spouse into the United States but have dressed up that claim under the garb of another constitutional right— procedural due process (in *Muñoz*) and the First Amendment (in this case).

The majority opinion holds that a U.S. citizen can assert a First Amendment right to speak with a foreign national

spouse within our borders but it ultimately denies the challenge on the merits.  I agree that the appeal is meritless but I believe that the consular nonreviewability doctrine precludes us from even reviewing Isaias Sanchez Gonzalez and his wife Celenia Yaqueline Gutierrez's bid to challenge the denial of his visa.  I also fear that creating this new expansive First Amendment exception could gut the consular nonreviewability doctrine and allow courts to meddle with the Executive Branch's plenary power to determine who may be admitted into our country.

* * * *

The consular nonreviewability doctrine comes from the long-held principle that the "admission and exclusion of foreign nationals is a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control."  *Trump v. Hawaii*, 585 U.S. 667, 702 (2017).  Thus, courts have "no role to play unless expressly authorized by law."  *Muñoz*, 602 U.S. at 908 (quotation marks and citation omitted).  And the Immigration and Nationality Act does not authorize judicial review of a consular officer's denial of a visa.  *Id.*

The Supreme Court most recently revisited this doctrine in *Muñoz*.  There, a U.S. citizen—whose husband's visa application had been denied for suspected ties to MS-13— challenged the denial asserting that her procedural due process rights had been violated.  602 U.S. at 903.  In invoking the consular nonreviewability doctrine, the Court held that Muñoz's wife—despite rooting her claim in procedural due process—in essence asserted a substantive due process right to live with her foreign national spouse in the United States.  *Id.* at 910-11 ("[H]ow else could Muñoz enjoy the asserted right to live with her noncitizen husband

in her country of citizenship?"). The Court then determined that a U.S. citizen has no fundamental liberty interest "deeply rooted in this Nation's history and tradition" in residing with a noncitizen spouse in the United States. *Id.* (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997)) (quotation marks omitted). Because a U.S. citizen possesses no such (substantive due process) constitutional right, the consular owed Muñoz no (procedural) due process. *Id.* at 909. As the Court noted, the "bottom line is that procedural due process is an odd vehicle for Munoz's argument." *Id.* at 919.

Here, Gutierrez tries the same gambit—but does so by smuggling a substantive due process claim under the cover of the First Amendment. Gutierrez's asserted First Amendment right—to hear her foreign national spouse speak about the everyday affairs of their family life from within U.S. borders—is fundamentally a right to bring her foreign spouse into the country. But *Muñoz* has already rejected that argument, holding that a U.S. citizen has no substantive due process right to live with her foreign national spouse in the United States. *Id.* at 909.

The majority, however, distinguishes *Muñoz*, arguing that the decision addressed procedural due process—not the First Amendment. The majority then contends that our case falls within the narrow First Amendment exception to the consular nonreviewability doctrine recognized in *Kleindienst v. Mandel*, 408 U.S. 753 (1972). But the two cases share few similarities. In *Mandel,* students at Stanford University challenged the government's decision to exclude a foreign Marxist economist from the country during the throes of the Cold War. 408 U.S. at 757. Mandel was traveling to deliver remarks at a major academic conference hosted by Stanford on the topic of revolutionary political

strategy. *Id.* In finding the consular's visa denial was reviewable, the Court said the students had a First Amendment right to "hear, speak, and debate" his viewpoints. *Id.*

To be sure, as the majority points out, *Mandel* did not expressly limit judicial review to cases involving core political speech. *See id.* at 762. But the Court characterized the First Amendment interest as a "right to receive information." *Id.* at 764-65. And that right furthered "the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail . . . . It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas." *Id.* at 765 (quoting *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 386-90 (1969)) (quotation marks omitted) (alteration in original).

Gutierrez's claim that she has a First Amendment right to hear her husband speak in person about the private affairs of their family life—whether it be about mundane things like household chores or more important matters like personal finances—bears little resemblance to core First Amendment values articulated in *Mandel*.[1] Indeed, it seems highly odd to characterize speaking with one's spouse about personal matters as a First Amendment right. Very few people would say that they have a First Amendment right to speak to their spouses in person in the United States. As in *Muñoz,* the "bottom line" is that the First Amendment (like

---

[1] The majority notes that our court has recognized the First Amendment right to receive information in contexts beyond core political speech. *See Thunder Studios v. Kazal*, 13 F.4th 736 (9th Cir. 2021). But that case still involved core First Amendment activity of protesting on the streets and leafletting. *Id.* at 745. Not so here.

procedural due process) "is an odd vehicle for [Gutierrez's] argument" that she has a constitutional right to be physically with her foreign national spouse in the United States.  602 U.S. at 919.

As a practical matter, I fear that we now risk opening the judicial floodgates for U.S. citizens to claim that they have a First Amendment right to have their foreign national family members to be admitted into the United States.  And without a limiting principle, such an elastic and expansive exception could potentially allow people to claim that they have a First Amendment right to admit into the United States and hear from foreign nationals who are friends, mentors, or distant relatives.  I would thus hold that we lack authority to review the denial of visa here.